COMMISSIONER OF MENTAL HEALTH AND
ADDICTION SERVICES ET AL. *v.*
FREEDOM OF INFORMATION
COMMISSION ET AL.
(SC 20686)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Keller and Cradle, Js.*

*Syllabus*

Pursuant to statute (§ 52-146e (a)), "communications and records as defined
in section 52-146d shall be confidential" and "no person may disclose

---

* This case originally was scheduled to be argued before a panel of this
court consisting of Chief Justice Robinson and Justices D'Auria, Mullins,
Ecker and Keller. Thereafter, Justice McDonald and Judge Cradle were
added to the panel and have read the briefs and appendices, and listened
to a recording of the oral argument prior to participating in this decision.

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

or transmit any communications and records or the substance or any part or any resume thereof which identify a patient . . . without the consent of the patient or his authorized representative.''

Pursuant further to statute (§ 52-146d (2)), the phrase ''communications and records'' is defined as ''all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatric mental health provider, or between a member of the patient's family and a psychiatric mental health provider, or between any of such persons and a person participating under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility . . . .''

The plaintiffs, the Commissioner of Mental Health and Addiction Services and the Department of Mental Health and Addiction Services (DMHAS), appealed to the trial court from the decision of the named defendant, the Freedom of Information Commission (commission), which ordered the disclosure, without redaction, of a police report to the defendant newspaper and its reporter, which the reporter had requested pursuant to the Freedom of Information Act (FOIA). The police report concerned the death of a patient, P, after a medical event at the Whiting Forensic Division of Connecticut Valley Hospital (Whiting), which is a maximum security, mental health treatment facility operated by DMHAS. DMHAS has its own police department, which is stationed at Whiting. The police report consisted of a collection of investigative reports, authored by DMHAS police officers, documenting the police department's investigation into P's death. In ordering disclosure, the commission concluded that the police report was not exempt from disclosure under the provision (§ 1-210 (b) (10)) of FOIA that exempts from disclosure communications privileged by the doctor-patient or therapist-patient relationship or any other common-law or statutory privilege. The commission reasoned that the police report did not relate to the diagnosis or treatment of P's mental health condition within the meaning of those terms, as set forth in § 52-146d (2), insofar as the officers who prepared the report had not participated in the diagnosis or treatment of P's mental health condition. The commission also concluded that disclosure of the police report did not violate the Health Insurance Portability and Accountability Act of 1996 (HIPAA) (42 U.S.C. § 1320d et seq.), as implemented by the Privacy Rule (45 C.F.R. § 160.101 et seq.), which generally prohibits a ''covered entity'' from disclosing protected ''health information'' without a valid authorization. The trial court sustained in part the plaintiffs' appeal from the commission's decision. The court concluded that the police report fell within the definition of ''communications and records'' in § 52-146d (2) because the report was prepared at a mental health facility and related to the treatment of a patient's mental health condi-

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

tion, but it nonetheless determined that the report could be disclosed so long as anything therein that identified a patient was redacted in accordance with § 52-146e (a). The court also concluded that, although the police report was prepared by a "covered entity" and contained "health information" within the meaning of HIPAA and the Privacy Rule, it could be released, pursuant to those provisions, only after references to any patient's identity and personally identifying health information were redacted. Thereafter, the commission appealed and the plaintiffs cross appealed from the trial court's judgment, seeking a determination as to whether the police report at issue was exempt from disclosure under FOIA, either because it was protected by the psychiatrist-patient privilege set forth in §§ 52-146d (2) and 52-146e (a), or by HIPAA and the Privacy Rule. *Held*:

1. Although the police report itself was not exempt from disclosure under § 1-210 (b) (10) of FOIA, as it was not a privileged psychiatrist-patient communication under §§ 52-146d (2) and 52-146e (a), this court ordered the redaction of certain information contained therein prior to disclosure:

a. This court concluded that the police report was not a communication or record thereof under § 52-146d (2):

It was clear from the plain language of §§ 52-146d (2) and 52-146e (a) that the psychiatrist-patient privilege applies only to communications or records thereof that relate to the diagnosis or treatment of a patient's mental health condition and that are between individuals who fall within the three categories of communicants delineated in § 52-146d (2), namely, the patient and a psychiatric mental health provider, a member of the patient's family and a psychiatric mental health provider, or one of those individuals and a person participating under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of the patient's diagnosis and treatment.

Moreover, this court clarified that not every communication involving or concerning a psychiatric patient necessarily relates to the diagnosis or treatment of that patient's mental health condition and rejected the notion that its case law stood for the broad proposition that the psychiatrist-patient privilege prohibits the disclosure of all communications and records that are made or prepared at a mental health facility and that identify a patient, regardless of the identities of the individuals between whom the communication is made.

In the present case, the police report, which was prepared after P stopped receiving treatment at Whiting, was not a part of P's clinical file, and, in view of the nature and timing of the postmortem investigation conducted by the DMHAS police officers, it was clear that the officers who prepared the report were not participating in the accomplishment of the objectives of diagnosis and treatment when they prepared the report

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

but, instead, were performing the traditional law enforcement function of investigating an untimely death.

Furthermore, there was no merit to the plaintiffs' claim that the phrase "wherever made, including communications and records which occur in or are prepared at a mental health facility" in § 52-146d (2) expanded the definition of "communications and records" to encompass all communications and records that are made or prepared in a mental health treatment facility and that relate to the diagnosis or treatment of a patient's mental condition, regardless of the identity of the individuals between whom the communications are made, as the legislative history and purpose of § 52-146d demonstrated that that phrase was not intended to create a freestanding category of confidential communications and records unique to mental health facilities but, instead, to clarify that the psychiatrist-patient privilege was not limited to communications between patients and private psychiatrists but also extended to communications relating to psychiatric treatment provided at publicly funded institutions that offer inpatient treatment.

In addition, in enacting FOIA, the legislature balanced competing principles concerning governmental transparency and patient confidentiality and provided, as it deemed appropriate, for certain exemptions from disclosure to protect patient confidentiality, and the decision as to whether the public policy of this state would best be served by creating a blanket exemption from disclosure of all records and documents relating to patients at Whiting rested with the legislature rather than this court.

b. There was substantial evidence in the administrative record to support the commission's finding that the police report was not a communication or record thereof, as those terms are defined in § 52-146d (2):

The police report, which related to and was generated after the death of a patient at Whiting, was not a communication between any of the individuals who are included in the three categories of communicants delineated in § 52-146d (2), as the report did not constitute a communication between a patient or a member of a patient's family and a psychiatric mental health provider, or between any such person and a person participating under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of the patient's diagnosis and treatment.

Rather, the police report was a communication between DMHAS police officers tasked with investigating P's death and an unknown recipient or recipients.

Moreover, regardless of who the intended recipient of the police report was, in view of the death of P, who was the subject of the report, it was clear that the officers were not participating in the accomplishment of the objectives of P's diagnosis and treatment when they prepared the

347 Conn. 675 AUGUST, 2023 679

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

report but, rather, were performing the traditional law enforcement func-
tion of investigating an untimely death and reporting the results of their
investigation, and this court could not conclude that the commission
acted arbitrarily, illegally, or in abuse of its discretion in determining
that the police report was not a communication or record within the
meaning of the statutory scheme.

Furthermore, although some DMHAS police officers responded to the
emergency medical event involving P, it was unclear whether they were
participating in their capacity as a member of the mental health treatment
team or, alternatively, performing the traditional law enforcement func-
tion of responding to an emergency, and, in light of that ambiguity, this
court could not substitute its own judgment for that of the commission.

Nevertheless, because the police report contained sensitive information
regarding the identity of two patients, namely, the names, dates of birth,
and home phone numbers of P and a second patient who witnessed the
medical event that led to P's death, and because the newspaper reporter
explicitly stated in his FOIA request that all references to a patient's
identity could be redacted, the commission improperly ordered the dis-
closure of that identifying information over the plaintiffs' objection, and,
accordingly, this court ordered that all references to patient names, dates
of birth, and home phone numbers be redacted from the report prior
to disclosure.

2. The police report was not exempt from disclosure under HIPAA and the
Privacy Rule:

The commission's interpretation of the Privacy Rule was not entitled to
deference, as the Privacy Rule was promulgated by the United States
Department of Health and Human Services, and such deference was not
warranted when, as in the present case, the agency interpreting the
regulation, namely, the commission, was not responsible for its promul-
gation.

The Privacy Rule contains various exemptions, including one that permits
a covered entity to use or disclose protected health information without
a valid authorization to the extent that such use or disclosure is "required
by law," and that term is defined to expressly include statutes or regula-
tions that compel an entity to use or disclose protected health infor-
mation.

Even if this court assumed that, under the Privacy Rule, the DMHAS
Police Department was a "covered entity" and that the police report
contained "health information," the police report was not shielded from
disclosure under HIPAA because its release was "required by law" under
FOIA, which is a state statute that requires the disclosure of public
records, and the police report, therefore, had to be disclosed, provided

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

that the names, dates of birth, and home phone numbers of the patients mentioned therein were redacted.

(*One justice concurring in part and dissenting in part*;
*two justices dissenting in one opinion*)

Argued September 8, 2022—officially released August 29, 2023

*Procedural History*

Appeal from the decision of the named defendant determining that the plaintiffs had violated the requirements of the Freedom of Information Act and ordering that they comply with those requirements by disclosing certain records to the defendant The Hartford Courant et al., brought to the Superior Court in the judicial district of New Britain and tried to the court, *Cordani, J.*; judgment sustaining the appeal in part, from which the named defendant appealed and the plaintiffs cross appealed. *Reversed in part*; *judgment directed.*

*Valicia Dee Harmon*, commission counsel, for the appellant-cross appellee (named defendant).

*Alma Rose Nunley*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, *Clare Kindall*, former solicitor general, and *Emily V. Melendez*, assistant attorney general, for the appellees-cross appellants (plaintiffs).

*Opinion*

ECKER, J. This appeal presents the issue whether a police report created by the police department at the Whiting Forensic Division of Connecticut Valley Hospital (Whiting)[1] is subject to disclosure under the Freedom of Information Act (FOIA), General Statutes § 1-200 et seq. The police report at issue documented the police department's investigation into the death of a patient at Whiting after a medical event. The named

_____

[1] After the events at issue in this appeal, Whiting separated from Connecticut Valley Hospital and became an independent division of the plaintiff Department of Mental Health and Addiction Services. See Executive Order No. 63 (January 2, 2018); see also General Statutes § 17a-560.

347 Conn. 675　　　AUGUST, 2023　　　681

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

defendant, the Freedom of Information Commission (commission), appeals from the judgment of the trial court, which ordered the disclosure of a redacted version of the police report under FOIA, claiming that the report should be released in its entirety because it is not exempt from disclosure by (1) the psychiatrist-patient communications privilege codified at General Statutes §§ 52-146d (2) and 52-146e (a), or (2) the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. § 1320d et seq., as implemented by the Privacy Rule, 45 C.F.R. § 160.101 et seq. The plaintiffs, the Commissioner of Mental Health and Addiction Services and the Department of Mental Health and Addiction Services (DMHAS), disagree and cross appeal, claiming that the police report should not be released at all, even in redacted form, because it is protected by the psychiatrist-patient communications privilege and HIPAA.

We conclude that the police report is not a communication or record, as those terms are used in § 52-146e (a), and, therefore, is not exempt from disclosure under FOIA. Nonetheless, the police report includes information that would identify a patient at Whiting, even though such information specifically was excluded from the FOIA request, and the report therefore should be redacted in the manner described in part III A 2 of this opinion. Because the police report, with minimal redaction, must be disclosed pursuant to FOIA, we further conclude that it is not protected from disclosure by HIPAA and its implementing Privacy Rule. Accordingly, we reverse in part the judgment of the trial court.

I

FACTS AND PROCEDURAL HISTORY

On November 9, 2017, Josh Kovner, a reporter with The Hartford Courant,[2] submitted a FOIA request to

---

[2] The Hartford Courant and Kovner were the complainants before the commission and were named as defendants in the administrative appeal, but they did not participate therein. Kovner died while the present case was pending in the trial court. There is no claim that his death affects the status

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

DMHAS, asking for the release of "DMHAS Police Department incident reports on any and all deaths in 2016 of Whiting . . . patients that were deemed 'accidental' by the [state] medical examiner's office, including, but not limited to, [the] death of a patient on Dec[ember] 1, 2016. At the time, in reference to the Dec[ember] 1, 2016, death, DMHAS said in a statement that the patient 'died due to a medical event.' " In his request, Kovner added that "[a]ll references to the identity of a patient can be redacted."

DMHAS denied Kovner's request, explaining that the responsive public record was exempt from disclosure under FOIA on three grounds: (1) it was protected by the psychiatrist-patient communications privilege codified at §§ 52-146d (2) and 52-146e (a); see General Statutes § 1-210 (b) (10); (2) it constituted "[p]ersonnel or medical files and similar files the disclosure of which would constitute an invasion of personal privacy"; General Statutes § 1-210 (b) (2); and (3) HIPAA's Privacy Rule "also prohibit[ed] the release of personal health information without the consent of the patient or the authorized representative."

Kovner filed a complaint with the commission challenging the denial of his FOIA request. The hearing officer conducted an evidentiary hearing, at which DMHAS submitted the police report, in both redacted and unredacted form, for in camera inspection. Additionally, DMHAS adduced the testimony of Diana Lejardi, its public information officer. Lejardi explained that Whiting is a "maximum security unit" that provides "specialized forensic services" to patients who are "involved in . . . legal matters" and "have severe mental illness . . . ." Patient treatment was overseen by Michael Norko, a forensic psychiatrist. "DMHAS has its own police department," which is "specifically trained

of this appeal.

347 Conn. 675 AUGUST, 2023 683

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

for DMHAS" and "located in different facilities, including in Whiting . . . ." According to Lejardi, DMHAS employs its own police force "for a number of reasons. One [is] because it is a maximum security unit, and they do general screening of people entering and exiting the facility. And, in addition . . . because [it] is a maximum security unit . . . there are, at times, patients with severe behaviors [who] may require some type of . . . interaction [with] or . . . assistance from . . . DMHAS police. So, staff may call a code, which would require . . . [the] police to respond."

At the hearing, Lejardi was asked whether DMHAS police reports are used to make decisions about patient diagnosis or treatment, and she responded that she did not "have enough knowledge" to answer that question. When asked whether it was likely that a police report would be used in the diagnosis or treatment of a patient, Lejardi answered: "I think it is likely that they can take reports because [that's] what . . . [the] police do— there are times [when] there are events between patients in which [the] police will take witness statements. . . . [W]e have to remember [that] these are patient[s] . . . with severe mental illness . . . [a]nd/ or substance use disorders. . . . [S]o, in the course of a witness statement . . . there may be information gathered that is used . . . or [that] the medical team or treatment team may use . . . or further explore at least." Lejardi acknowledged, however, that information in a police report "obviously . . . would not be used to make the diagnosis or treatment of the [patient] . . . [i]f the person passed away."

Following the hearing and in camera inspection of the police report, the hearing officer issued a written decision, finding that the police report was subject to disclosure without redaction under FOIA. The hearing officer's decision was adopted unanimously by the com-

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

mission. In arriving at its conclusion, the commission recognized that the police report "contain[s] the name or other identifying information of a patient" but determined that it was not protected by the psychiatrist-patient communications privilege on the ground that "the police officers [did] not participate in the diagnosis or treatment of a patient's mental condition . . . ." Because "none of the requested records [was] between the patient and a psychiatrist, or between a member of the patient's family and a psychiatrist, or between any of such persons and a person participating under the supervision of a psychiatrist in the accomplishment of the objectives of diagnosis and treatment," the commission concluded that the police report did not "relate to the diagnosis or treatment of a patient's mental condition, within the definition[s] set forth in [§§] 52-146d (2) [and 52-146e (a)]."[3] The commission also found that the police report was not exempt from disclosure under the personal privacy exemption in § 1-210 (b) (2).[4]

[3] General Statutes § 52-146e (a) provides: "All communications and records as defined in section 52-146d shall be confidential and shall be subject to the provisions of sections 52-146d to 52-146j, inclusive. Except as provided in sections 52-146f to 52-146i, inclusive, no person may disclose or transmit any communications and records or the substance or any part or any resume thereof which identify a patient to any person, corporation or governmental agency without the consent of the patient or his authorized representative."

The phrase "communications and records" is defined in § 52-146d (2) as "all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatric mental health provider, or between a member of the patient's family and a psychiatric mental health provider, or between any of such persons and a person participating under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility . . . ."

Although § 52-146d was the subject of technical amendments in 2019; see Public Acts 2019, No. 19-98, § 24; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[4] The commission reasoned that the police report did not fall within the scope of the personal privacy exemption because it is "a police report of

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

As for the claim of exemption under HIPAA, the commission concluded that HIPAA was inapplicable because the DMHAS police department is not a "covered entity" and the police report did not include "health information," as defined by 45 C.F.R. § 160.103. Alternatively, even if HIPAA applied, the commission determined that the police report was subject to disclosure under the exemption in 45 C.F.R. § 164.512 (a), which provides that "[a] covered entity may use or disclose protected health information to the extent that such use or disclosure is required by law and the use or disclosure complies with and is limited to the relevant requirements of such law." Because FOIA requires the disclosure of public records in the absence of an applicable exemption, and there was no applicable exemption in this case, the commission concluded that the police report was not protected by HIPAA.

DMHAS appealed from the decision of the commission to the Superior Court pursuant to the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-183. The trial court concluded that "communications and records" in § 52-146d (2), which defines the operative terms of the statutory privilege in § 52-146e (a), broadly encompasses all "records that occur in, or are prepared at, a mental health facility relating to the treatment of a patient's mental condition . . . ." Because Whiting is a mental health facility, the subject of the police report was a patient at Whiting, the DMHAS police department is a specialized force stationed and

a death and did not contribute to [the] making [of] a medical decision," the patient's right of personal privacy did not survive his death, and, "[e]ven if the [patient's] privacy rights survived his death, the [police report] is a legitimate matter of public concern, and disclosure of it would not be highly offensive to a reasonable person." See General Statutes § 1-210 (b) (2) (exempting "[p]ersonnel or medical files and similar files the disclosure of which would constitute an invasion of personal privacy"). DMHAS does not challenge this determination on appeal, and, therefore, we do not address whether the police report is exempt from disclosure under § 1-210 (b) (2).

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

employed at Whiting, and the provision of mental health treatment services at Whiting depends on the presence of the DMHAS police, the trial court concluded that the police report came within the scope of the statutory privilege, insofar as it was "prepared at a mental health facility" and "relate[d] to the treatment of the mental condition of a patient" within the meaning of § 52-146d (2). The hearing officer's determination to the contrary was "not supported by substantial evidence in the record and [was] a clear error of law."

The trial court nonetheless concluded that the police report could be disclosed with redaction to remove information that would "identify a patient" in accordance with § 52-146e (a). (Footnote omitted.) The analysis of whether a public record identifies a patient, the trial court stated, "does not take into consideration what the public may or may not know . . . ." Instead, the statutory focus in § 52-146d (4) is on the public records themselves and the "names or other descriptive data" they contain, "from which a person acquainted with the patient might reasonably recognize the patient as the person referred to . . . ." General Statutes § 52-146d (4) (A).[5] After reviewing the police report in camera, the trial court concluded that "a redacted form of the record [could] be provided without identifying the patient."

With respect to HIPAA, the trial court concluded that the police report was prepared by a "covered entity" because Whiting and DMHAS are both health care providers. The trial court further concluded that the police report contained "health information," as defined by

---

[5] General Statutes § 52-146d (4) provides that the terms " '[i]dentifiable' and 'identify a patient' refer to communications and records which contain (A) names or other descriptive data from which a person acquainted with the patient might reasonably recognize the patient as the person referred to, or (B) codes or numbers which are in general use outside of the mental health facility which prepared the communications and records . . . ."

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

HIPAA, because it identified a mental health patient and contained "information concerning the patient's physical and mental health." Although the consent of the patient or his authorized representative had not been provided in accordance with HIPAA, the trial court nonetheless concluded that the police report could be released consistent with HIPAA following the redaction of references to the patient's identity and personally identifying health information.

This appeal and cross appeal followed.[6] On appeal, the parties renew the claims they raised before the commission and the trial court, asking us to determine whether the police report is exempt from disclosure under FOIA because it is protected by the psychiatrist-patient communications privilege and/or HIPAA's Privacy Rule.

II

STANDARD OF REVIEW

The standard of review applicable to agency decisions under the UAPA is well established. "Our review of an agency's factual determination is constrained by . . . § 4-183 (j), which mandates that a court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. . . . [I]t is [not] the function of the trial court [or] of this court to retry the case . . . . An agency's factual determination must be sustained if it is reasonably supported by substantial evidence in the record taken as a whole. . . . Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . This substantial evidence standard is highly deferential and

[6] The commission appealed and DMHAS cross appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal and cross appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review.'' (Internal quotation marks omitted.) *Board of Education* v. *Commission on Human Rights & Opportunities*, 266 Conn. 492, 503–504, 832 A.2d 660 (2003).

Even with respect to conclusions of law, ''[t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . [Thus] [c]onclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts.'' (Internal quotation marks omitted.) *Meriden* v. *Freedom of Information Commission*, 338 Conn. 310, 318–19, 258 A.3d 1 (2021).

We will defer to an agency's construction of a statute or administrative regulation if the language at issue is ambiguous and the agency's construction is time-tested, reasonable, and previously has been subject to judicial scrutiny. See, e.g., *Marone* v. *Waterbury*, 244 Conn. 1, 9–10, 707 A.2d 725 (1998) (even if agency's interpretation of statute is time-tested because ''the agency has consistently followed its construction over a long period of time, the statutory language is ambiguous, and the agency's interpretation is reasonable,'' agency's interpretation is not entitled to special deference if it ''has not previously been subject to judicial scrutiny'' (internal quotation marks omitted)). When the statute or regulation at issue is not ambiguous, or the agency's construction of the statute or regulation is not time-tested, reasonable, or has not previously been subjected to judicial scrutiny, ''we apply a broader standard of review . . . .'' (Internal quotation marks omitted.) Id., 10.

The commission does not claim that its construction of the psychiatrist-patient communications privilege in

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

§§ 52-146d (2) and 52-146e (a) is entitled to deference, but it does claim that its construction of HIPAA's Privacy Rule is entitled to deference because it "has construed HIPAA's regulatory scheme consistently and reasonably for years." DMHAS responds that "such deference is not afforded [when] an agency is interpreting a different agency's statute or regulations." In *Commissioner of Correction* v. *Freedom of Information Commission*, 307 Conn. 53, 52 A.3d 636 (2012), we held that it is only "the interpretation of the promulgating agency . . . [that] is entitled to deference by this court" because an agency that did not promulgate the regulations under review does not have "special expertise" in the subject matter of the regulations or the intent that prompted their promulgation. Id., 65; see id. (declining to defer to commission's interpretation of regulations promulgated by United States Department of Justice Immigration and Naturalization Service because "[t]he commission has no special expertise in federal immigration law, in federal criminal law enforcement policies and procedures, or in questions of national security, which matters are the subject of the regulation," and "the intent of our state legislators when setting policy and enacting laws regarding access to public records in this state has no bearing on the intent of the federal agency that promulgated the regulation"). We agree with DMHAS that the commission's interpretation of the Privacy Rule, which was promulgated by the United States Department of Health and Human Services, is not entitled to deference.

Thus, the scope of the psychiatrist-patient communications privilege codified at §§ 52-146d (2) and 52-146e (a) and in HIPAA's Privacy Rule are questions of law, which we review de novo. See, e.g., *Commissioner of Public Safety* v. *Freedom of Information Commission*, 301 Conn. 323, 337–38, 21 A.3d 737 (2011). Our analysis

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

of §§ 52-146d (2) and 52-146e (a) is governed by the principles of statutory construction set forth in General Statutes § 1-2z. With respect to HIPAA's Privacy Rule, "principles of comity and consistency require us to follow the [federal] plain meaning rule," as construed by the federal courts. (Internal quotation marks omitted.) *Szewczyk* v. *Dept. of Social Services*, 275 Conn. 464, 474–75, 881 A.2d 259 (2005); see *Soto* v. *Bushmaster Firearms International, LLC*, 331 Conn. 53, 117–18, 202 A.3d 262 (discussing federal plain meaning rule), cert. denied sub nom. *Remington Arms Co., LLC* v. *Soto*, U.S. , 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019).

III

FOIA

Section 1-210 (a) of FOIA provides in relevant part that, "[e]xcept as otherwise provided by any federal law or state statute, all records maintained or kept on file by any public agency, whether or not such records are required by any law or by any rule or regulation, shall be public records and every person shall have the right to" inspect, copy, and receive a copy of such records, subject to the exemptions enumerated in subsection (b) of the statute. We consistently have held that "the long-standing legislative policy of [FOIA] favoring the open conduct of government and free public access to government records . . . requires us to construe the provisions of [FOIA] to favor disclosure and to read narrowly that act's exceptions to disclosure." (Citations omitted; internal quotation marks omitted.) *Waterbury Teachers Assn.* v. *Freedom of Information Commission*, 240 Conn. 835, 840, 694 A.2d 1241 (1997). The exemptions contained in FOIA "reflect a legislative intention to balance the public's right to know what its agencies are doing, with the governmental and private needs for confidentiality. . . . [I]t is this balance of the governmental and private needs for confidentiality with the public right to know that must govern

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

the interpretation and application of [FOIA]. . . . Our
construction of [FOIA] must be guided by the policy
favoring disclosure and exceptions to disclosure must
be narrowly construed. . . . [T]he burden of proving
the applicability of an exemption rests [on] the agency
claiming it." (Citations omitted; internal quotation marks
omitted.) *Commissioner of Emergency Services & Public Protection* v. *Freedom of Information Commission*,
330 Conn. 372, 383–84, 194 A.3d 759 (2018); see *Lieberman* v. *State Board of Labor Relations*, 216 Conn. 253,
266, 579 A.2d 505 (1990) ("[i]n those limited circumstances [in which] the legislature has determined that
some other public interest overrides the public's right
to know, it has provided explicit statutory exceptions
. . . [that] must be narrowly construed" (citation
omitted)).

A

Psychiatrist-Patient Communications Privilege

The parties dispute whether the police report at issue
in this appeal is exempt from disclosure under subsection (b) (10) of § 1-210, which provides in relevant part
that "[n]othing in [FOIA] shall be construed to require
disclosure of . . . communications privileged by the
. . . doctor-patient relationship, therapist-patient relationship or any other privilege established by the common law or the general statutes . . . ." The only
applicable communications privilege raised by DMHAS
is the statutory psychiatrist-patient communications
privilege contained in §§ 52-146d (2) and 52-146e (a).

Our analysis of the exemption for psychiatrist-patient
communications proceeds in two parts. Because the
only information that is privileged under § 52-146e (a)
is "the substance or any part or any resume"[7] of "com-

---

[7] The term "resume" is not defined in the statutory scheme, but, as used
in § 52-146e, it appears to refer to "a summing up . . . [or] a condensed
statement . . . ." Webster's Third New International Dictionary (2002) p.
1937.

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

munications and records as defined in section 52-146d,''
we first address the definition of ''communications and
records'' in § 52-146d (2) to determine the scope of the
privilege. Second, we address whether there is substan-
tial evidence in the administrative record to support
the commission's finding that the police report is not
a communication or record, as defined by § 52-146d (2).

1

### Definition of ''Communications and Records''
### in § 52-146d (2)

The psychiatrist-patient communications privilege
did not exist at common law and is entirely a creature
of statute. See *Zeiner* v. *Zeiner*, 120 Conn. 161, 167,
179 A. 644 (1935) (''[i]n this [s]tate, information acquired
by physicians in their professional capacity ha[d] never
been privileged''). The purpose of the psychiatrist-
patient communications privilege ''is to protect a thera-
peutic relationship. The statute provides a privilege for
confidential communications so that a patient may
safely disclose to his therapist personal information
that is necessary for effective treatment or diagnosis.
. . . Communications that bear no relationship to the
purpose for which the privilege was enacted do not
obtain shelter under the statute and are [not privi-
leged].'' (Citation omitted.) *Bieluch* v. *Bieluch*, 190
Conn. 813, 819, 462 A.2d 1060 (1983); see *Home Ins.
Co.* v. *Aetna Life & Casualty Co.*, 235 Conn. 185, 195,
663 A.2d 1001 (1995) (''the principal purpose of [the]
privilege is to give the patient an incentive to make full
disclosure to a physician in order to obtain effective
treatment free from the embarrassment and invasion
of privacy [that] could result from a doctor's testimony''
(internal quotation marks omitted)).[8]

---

[8] We have characterized the psychiatrist-patient privilege as ''broad''
because it is not limited to communications between the patient and the
psychiatrist ''but also [extends to] all communications relating to the
patient's mental condition between the patient's family and the psychiatrist
and his staff and employees, as well as records [thereof] prepared at mental

347 Conn. 675 AUGUST, 2023 693
Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

We begin our analysis, as we must, with the language of §§ 52-146d (2) and 52-146e (a). See General Statutes § 1-2z. The textual focus of § 1-2z is consistent with the cardinal and long-standing rule of statutory construction that courts may not overlook the text of a statute in order to advance unarticulated policy considerations, even if those policies are salutary and advisable. See, e.g., *Trinity Christian School* v. *Commission on Human Rights & Opportunities*, 329 Conn. 684, 697–98, 189 A.3d 79 (2018) ("[i]t is not the province of this court, under the guise of statutory interpretation, to legislate . . . a [particular] policy, even if we were to agree . . . that it is a better policy than the one endorsed by the legislature as reflected in its statutory language" (internal quotation marks omitted)). Upon careful examination, the text of §§ 52-146d (2) and 52-146e (a) goes a long way toward resolving this appeal.

Section 52-146e (a) expressly limits the scope of the privilege to "communications and records as defined in section 52-146d . . . ." Section 52-146d (2), in turn, provides that " '[c]ommunications and records' means all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatric mental health provider, or between a member of the patient's family and a psychiatric mental health provider, or between any of such persons and a person participating under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility . . . ." See also General Statutes § 52-146d (5) (defining "mental health facility" as "any hospital, clinic, ward, psychiatric mental health provider's office or other facility, public or

health facilities." (Internal quotation marks omitted.) *State* v. *Kelly*, 208 Conn. 365, 379, 545 A.2d 1048 (1988).

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

private, which provides inpatient or outpatient service, in whole or in part, relating to the diagnosis or treatment of a patient's mental condition'').

It is clear from the plain language of this statutory definition that the legislature limited the psychiatrist-patient communications privilege in three important respects. First, the privilege applies only to communications and records *thereof*, which means records *of communications*.[9] Of course, the definition includes more than oral and written communications and records documenting such communications, because records can themselves be (or become) communications. For example, information documented in a patient's medical file—such as a provider's clinical observations and treatment notes, orders relating to medications or treatment, and lab test results—can constitute communications from one mental health provider to another regarding a patient's diagnosis and treatment. With that caveat, however, the statutory text leaves no room for debate that only communications and records of communications are privileged under §§ 52-146d (2) and 52-146e (a) and exempt from disclosure under FOIA.

Second, the communication or record thereof must ''relat[e] to'' the diagnosis and treatment of a patient's mental condition. General Statutes § 52-146d (2). As we previously have observed, ''the term 'relating to' uniformly has been given a broad meaning . . . .'' (Footnote omitted.) *Brennan* v. *Brennan Associates.*, 293 Conn. 60, 79, 977 A.2d 107 (2009); see *Lombardo's Ravioli Kitchen, Inc.* v. *Ryan*, 268 Conn. 222, 233, 842 A.2d 1089 (2004) (referring to definition of ''related'' in Webster's Third New International Dictionary as ''having relationship: connected by reason of an established or

_____

[9] The term ''thereof'' plainly and unambiguously refers to communications, that is, records *of communications*. See Webster's Third New International Dictionary (2002) p. 2372 (defining ''thereof'' as ''of that: of it'' or ''from that cause: from that particular'').

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

discoverable relation'' (internal quotation marks omitted)). We must nevertheless remain cognizant that the breadth of this term does not mean that every communication involving or regarding a patient under psychiatric care—even a patient hospitalized in a mental health facility—will relate to the diagnosis and treatment of a patient's mental health condition. See, e.g., *State* v. *Montgomery*, 254 Conn. 694, 725, 759 A.2d 995 (2000) (statement of person hospitalized in mental health facility "bore no relation to . . . diagnosis or treatment"). Section 52-146d (2) provides that the communication or record thereof is privileged only if it relates to the diagnosis and treatment of a patient's mental condition.

Third, the communication or record thereof must be between individuals identified in the following three categories of communicants delineated in § 52-146d (2): (1) "the patient and a psychiatric mental health provider"; (2) "a member of the patient's family and a psychiatric mental health provider"; and (3) the patient, the psychiatric mental health provider, or the patient's family member, and "a person participating under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility . . . ." With respect to the third category of communicants, the use of the present participle "participating"[10] plainly means that the person from whom or to whom the communication is made must actually be involved "in the accomplishment of the objectives of diagnosis and treatment . . . ." General Statutes § 52-146d (2). Only a communication or a record of a communication between individuals identified in these three categories is protected by the psychiatrist-patient

[10] The word "participate" means "to take part in something (as an enterprise or activity) [usually] in common with others . . . ." Webster's Third New International Dictionary (2002) p. 1646.

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

communications privilege. Communications or records of communications between other individuals, or those that are unrelated to the diagnosis and treatment of a patient's mental condition, are not privileged psychiatrist-patient communications and, therefore, are not protected from disclosure under FOIA.

Our prior case law on the subject helps illuminate the nature and scope of these three limitations. In *State* v. *Montgomery*, supra, 254 Conn. 721–25, we considered whether statements made by a patient at a mental health facility were communications or records protected from disclosure by the psychiatrist-patient communications privilege. In that case, a psychiatrist at Cedarcrest Hospital had assigned Elaine Janas, a mental health assistant, to monitor a mental health patient, Tyrone Montgomery. See id., 722–23. While monitoring Montgomery, Janas overhead him make a statement to an unknown third party over the telephone in an alleged attempt to concoct a false alibi regarding his involvement in a murder. Id., 723. At Montgomery's later criminal trial, the state sought to admit Janas' testimony regarding Montgomery's inculpatory statement. Id. We held that Montgomery's statement was not a protected communication because it was not a communication "between [Montgomery] and a psychiatrist or Janas, but, rather, between [Montgomery] and an unknown third party located outside of the hospital" that "bore no relation to [Montgomery's] diagnosis or treatment." Id., 725. The "mere fact[s]" that Montgomery's statement was made in a mental health institution and that "Janas was assigned to observe [Montgomery] for his own protection [did] not transform [Montgomery's] statement into a protected communication under the psychiatrist-patient privilege. A contrary determination would extend that privilege well beyond the plain statutory language that defines it." Id.

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

Both DMHAS and Justice Keller in her dissenting opinion contend that our decision in *Falco* v. *Institute of Living*, 254 Conn. 321, 757 A.2d 571 (2000), adopted a far broader construction of "communications and records," one that includes *all* communications and records that were made at or prepared in a mental health facility and that identify a patient. See part II of the dissenting opinion. We cannot agree that our decision in *Falco* construed § 52-146d (2) to encompass communications beyond the limited categories set forth in the statutory definition. Indeed, *Falco* did not address—much less adjudicate—the definition of "communications and records" in § 52-146d (2) because the parties in that case agreed that "§ 52-146e control[led] and that no appropriate statutory exception [to the psychiatrist-patient communications privilege] applie[d]." Id., 325. Instead, the issue before us in *Falco* was whether the trial court could exercise its discretion to override the psychiatrist-patient communications privilege and to order a bill of discovery requiring the disclosure of a mental health patient's name, last known address, and social security number due to "compelling countervailing interests not explicitly recognized by the legislature." (Internal quotation marks omitted.) Id. In light of the plain language of § 52-146e (a), which "specifically prohibits the disclosure or transmission of any communications or records that would 'identify a patient' "; id., 329; and the absence of an applicable statutory exception, we concluded that it was "contrary to the language of the statute and the intent of the legislature for courts to make discretionary case-by-case determinations of when the privilege may be overridden." Id., 331. We recognized that communications unrelated to the purpose for which the privilege was enacted are not protected from disclosure but determined that the identity of a patient is related to the purpose of the psychiatrist-patient communications

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

privilege because "[t]he confidentiality of a patient's identity is as essential to the statutory purpose of preserving the therapeutic relationship as the confidentiality of any other information in a patient's communications and records." Id., 329.

*Falco* does not stand for the unjustifiably broad proposition that the psychiatrist-patient communications privilege prohibits the disclosure of *all* documents or information prepared at a mental health facility from which a patient can be identified. The scope of the statutory definition was not at issue in that case.[11] Our statements in *Falco* regarding the privileged nature of communications that identify a patient must be understood in the context in which they were made, i.e., in response to an argument that information identifying a patient is not privileged because it is unrelated to the purpose for which the psychiatrist-patient communications privilege was enacted. We rejected this notion, reasoning that the protection of a patient's identity within confidential communications is essential to the statutory purpose of preserving the therapeutic relationship and shielding patients from the stigma of seeking psychiatric care. Id. Any suggestion that our holding in *Falco* expanded the definition of "communications

---

[11] We disagree with Justice Keller that we "incorrectly [represent] this court's analysis" in *Falco*. Part II of the dissenting opinion. Nowhere in *Falco* did we discuss the meaning of the statutory definition of "communications and records" in § 52-146d (2). As Justice Keller points out; see id.; we did discuss the meaning of the term "identify a patient" in § 52-146d (4), stating that "the phrase ' "identify a patient" refer[s] to communications and records which contain (A) names or other descriptive data from which a person acquainted with the patient might reasonably recognize the patient as the person referred to, or (B) codes or numbers which are in general use outside of the mental health facility which prepared the communications and records . . . .' " *Falco* v. *Institute of Living*, supra, 254 Conn. 329, quoting General Statutes § 52-146d (4). Nothing in our discussion of subdivision (4) of § 52-146d was intended to expand, either implicitly or explicitly, the statutory definition of "communications and records" in subdivision (2) of that statute beyond its plain language.

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

and records'' in § 52-146d (2) beyond its plain language
is unfounded.

In *Freedom of Information Officer, Dept. of Mental
Health & Addiction Services* v. *Freedom of Information
Commission*, 318 Conn. 769, 122 A.3d 1217 (2015)
(*Freedom of Information Officer*), we reinforced our
commitment to the plain language of the statutory defi-
nition. In that case, we addressed whether medical and
dental records prepared at a mental health facility and
maintained in the patient's clinical file were ''communi-
cations and records,'' as defined by § 52-146d (2). See
id, 783–89 and n.8. We concluded that the medical and
dental records at issue in that case were ''not communi-
cations directly between [the patient] and a psychiatrist
or between a member of [the patient's] family and a
psychiatrist.'' Id., 783. Nevertheless, we noted that ''the
definition of [c]ommunications and records in § 52-146d
(2) does not stop there. Section 52-146d (2) further
defines [c]ommunications and records to include all
oral and written communications and records thereof
relating to diagnosis or treatment of a patient's mental
condition . . . *between any of such persons and a per-
son participating under the supervision of a psychia-
trist in the accomplishment of the objectives of
diagnosis and treatment, wherever made, including
communications and records which occur in or are
prepared at a mental health facility* . . . .'' (Emphasis
added; internal quotation marks omitted.) Id. We held
that this third category of ''communications and records
thereof'' was applicable because there was evidence
''that the medical and dental records at issue were cre-
ated at the hospital during [the patient's] inpatient treat-
ment'' and ''under the direction of a psychiatrist,'' who
was ''the superintendent of the facility at the time [the
patient]'' was receiving treatment. Id., 785–86. We twice
noted that the records were maintained as part of the
patient's clinical file at the hospital. Id., 783, 790. Addi-

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

tionally, we recognized that General Statutes § 17a-545 reflects a legislative judgment that "mental health conditions are often related to physical disorders and that the proper treatment of mental health involves the treatment of physical issues as well." Id., 790–91; see General Statutes § 17a-545 (requiring inpatient mental health facilities to conduct physical examinations of patients). Because the medical and dental records were "created by an inpatient mental health facility during the treatment of a patient" and were related to the objectives of the patient's diagnosis and treatment, we held that they satisfied the statutory definition of "communications and records" in § 52-146d (2) and were exempt from disclosure under FOIA. *Freedom of Information Officer, Dept. of Mental Health & Addiction Services* v. *Freedom of Information Commission*, supra, 791; see id., 786.

Both Chief Justice Robinson, in his concurring and dissenting opinion, and Justice Keller, in her dissenting opinion, contend that our holding in *Freedom of Information Officer* requires us to conclude that the police report in the present case falls within the statutory privilege. See, e.g., part I of the dissenting opinion. We see a world of difference, however, between the operative facts of that case and this one. *Freedom of Information Officer* involved the disclosure of medical and dental records that were part of the patient's clinical file at the psychiatric facility and were prepared at a time when the patient was receiving treatment from persons who were participating in the accomplishment of the objectives of diagnosis and treatment. See *Freedom of Information Officer, Dept. of Mental Health & Addiction Services* v. *Freedom of Information Commission*, supra, 318 Conn. 780, 783, 790. In contrast, the police report at issue in this case was not a part of the patient's clinical file and was prepared after the patient had stopped receiving treatment at Whiting.

347 Conn. 675 AUGUST, 2023 701

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

Given the nature and timing of the postmortem investigation conducted by the DMHAS police officers, it is clear that the officers who produced the report were not participating in the accomplishment of the objectives of diagnosis and treatment when they authored the report but, instead, were performing the traditional law enforcement function of investigating an untimely death. See part III A 2 of this opinion. Accordingly, the report is not a communication or record protected by the statutory psychiatrist-patient communications privilege.[12]

DMHAS also argues that the plain language of § 52-146d (2) encompasses all communications and records of communications made at or prepared in a mental health facility relating to the diagnosis and treatment of a patient's mental condition, regardless of the identity of the communicants, because the final clause of the statute expands the definition of "communications and records" to include all communications and records thereof "*wherever made, including communications and records which occur in or are prepared at a mental health facility* . . . ." (Emphasis added.) General Statutes § 52-146d (2). According to DMHAS, the phrase "including communications and records which occur in or are prepared at a mental health facility" must be construed expansively because, otherwise, the phrase "wherever made" would be superfluous, contrary to our rules of statutory construction. See, e.g., *Semerzakis* v. *Commissioner of Social Services*, 274 Conn. 1, 18, 873 A.2d 911 (2005) ("[s]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant" (internal quotation marks omitted)).

---

[12] As we explain in greater detail in part III A 2 of this opinion, there is substantial evidence in the administrative record to support the commission's finding that DMHAS did not make the required showing that the police report falls within the definition of "communications and records" in § 52-146d (2).

702                    AUGUST, 2023          347 Conn. 675
Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

We find no merit in this argument. We previously
have held in other statutory contexts that the word
"including" is ambiguous because it typically is unclear
whether it is "intended as a word of limitation . . . or
one of enlargement . . . ." (Internal quotation marks
omitted.) *State* v. *DeFrancesco*, 235 Conn. 426, 435, 668
A.2d 348 (1995); see, e.g., *Hartford Electric Light Co.*
v. *Sullivan*, 161 Conn. 145, 150, 285 A.2d 352 (1971)
(noting that term " 'include' is primarily defined as a
term of limitation" but also "can be a term of enlarge-
ment"). We therefore turn to extratextual sources of
legislative intent to determine whether the legislature
intended to protect *all* communications and records
of communications created in a mental health facility,
regardless of whether they are "between the patient
and a psychiatric mental health provider, or between a
member of the patient's family and a psychiatric mental
health provider, or between any of such persons and a
person participating under the supervision of a psychi-
atric mental health provider in the accomplishment of
the objectives of diagnosis and treatment . . . ." Gen-
eral Statutes § 52-146d (2).

The phrase "wherever made, including communica-
tions and records which occur in or are prepared at a
mental health facility," was added to the statutory
scheme in 1969 as part of a comprehensive overhaul
of the psychiatrist-patient communications privilege.
See Public Acts 1969, No. 819, § 1. According to the
legislative history,[13] the purpose of No. 819 of the 1969

---

[13] DMHAS claims that we cannot consider the legislative history underlying
the definition of "communications and records" in § 52-146d (2) because
the commission failed to rely on the legislative history in the trial court,
and, therefore, the commission's argument is not preserved for our review.
We reject this contention. Because we have determined that § 52-146d (2)
is ambiguous, we are permitted by statute to resolve the ambiguity by
considering extratextual sources of legislative intent, such as legislative
history. See General Statutes § 1-2z (permitting resort to "extratextual evi-
dence" if statutory language is ambiguous or yields absurd or unworkable
results). Indeed, once the text of a statute has been deemed to be ambiguous
or absurd and unworkable, consideration of legislative history undoubtedly

347 Conn. 675 AUGUST, 2023 703

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

Public Acts was to balance the legitimate needs of researchers to access confidential psychiatric communications with the privacy interests of patients. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1969 Sess., p. 92, remarks of Ben Bursten, a psychiatrist (explaining that statute "represents a delicate balance between the patient's rights and the advantages offered by the new technology" of computerized research, thus "allow[ing] research and administration to proceed while safeguarding the confidentiality of the patient's communications"); id., pp. 100–101, statement of Gerald L. Klerman, a psychiatrist and the director of the Connecticut Mental Health Center ("This [b]ill recognizes these new advances and expanding needs [arising from new information technology, new forms of treatment, and new forms of mental health organizations]. It balances the rights of individuals with the needs of society. It allows for [the] collection of data for administrative planning and research while providing safeguards for patients' privacy and confidentiality." (Internal quotation marks omitted.)). The amendment was intended to clarify that the psychiatrist-patient communications privilege is not limited to communications between patients and private psychiatrists but also extends to communications relating to psychiatric treatment provided at publicly funded institutions that offer inpatient treatment. See id., p. 82, remarks of Representative Mary B. Griswold ("[w]e do have protection of private patients but it has never been clearly stated that such privacy extends to patients in public institutions"); id., p. 99, remarks of Attorney John Rose ("I think that it's a terrifically important bill because it

falls within our "independent power to identify and apply the proper construction of governing law . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 148, 84 A.3d 840 (2014). Our task is to ascertain the meaning of the statute, and the means available to us are not limited to the arguments made previously by the parties.

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

protects all patients' confidentiality including that of the indigent person being treated in a state hospital''). There is no indication that the legislature intended to adopt a broader privilege, applicable only to records created at mental health facilities, that applies regardless of the express limitations contained in the statutory definition relating to the identities of the communicants and the content of the communications. To the contrary, the purpose of the amendment was, in part, to create a uniform standard applicable to all communications or records thereof relating to psychiatric treatment, regardless of the setting in which the psychiatric treatment is provided.

In light of the legislative history and the purpose of the statute, we conclude that the phrase ''including communications and records which occur in or are prepared at a mental health facility'' was not intended to create a freestanding category of confidential communications and records unique to mental health facilities but, instead, was intended ''as an illustrative application of 'wherever made' . . . .'' *Skakel* v. *Benedict*, 54 Conn. App. 663, 673, 738 A.2d 170 (1999); see id., 673–74 (rejecting claim that definition of ''communications and records'' is limited to confidential communications ''between designated parties that occurred in or were prepared at a mental health facility'' and concluding that mental health facility is just illustrative application of '' 'wherever made' ''). We reject DMHAS' claim that all communications and records thereof prepared in a mental health facility that identify a patient are privileged under § 52-146e (a), regardless of whether they were communications between the individuals identified in the three categories of communicants delineated in § 52-146d (2).

Justice Keller criticizes our construction of the statutory scheme on the grounds that it creates ''a two tiered system for applying the psychiatrist-patient privilege''

347 Conn. 675 AUGUST, 2023 705

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

and contravenes the legislature's stated "intent to provide the same level of protection to the psychiatric records of persons who receive treatment from a public mental health institution as that afforded to the records of persons who receive treatment from a private mental health care provider." The dissenting opinion also states that we have implicitly added a FOIA "exception" to the privilege, such that an otherwise privileged document becomes disclosable if requested under FOIA. Footnote 5 of the dissenting opinion. This criticism misses the mark. Section 52-146e (a) has the same coverage and limitations regardless of whether the patient seeks treatment at a state operated mental health treatment facility or a private hospital. The communications and records of patients who seek treatment at a private mental health treatment facility are not inviolate; they are subject to disclosure under § 52-146e (a) to the same extent and in the same manner as the communications and records of patients who seek treatment at a public mental health facility.[14] Conversely, the communications and records of patients who seek treatment at a public mental health facility are not inferior or entitled to less protection; they are privileged in accordance with the dictates of §§ 52-146d (2) and 52-146e (a). If a communication is privileged, it may not be disclosed under FOIA.[15]

---

[14] To illustrate, if the very same events that occurred in the present case had taken place at a private hospital, a police report created under the same conditions would not be privileged from disclosure under § 52-146e (a).

[15] Any differential treatment between public and private institutions with respect to communications and records that are not privileged under §§ 52-146d (2) and 52-146e (a) derives solely from the applicability of FOIA, the very purpose of which is to provide access to public records. See, e.g., *Stamford* v. *Freedom of Information Commission*, 241 Conn. 310, 314, 696 A.2d 321 (1997) ("[t]he sponsors of [FOIA] understood the legislation to express the people's sovereignty over the agencies [that] serve them . . . and this court consistently has interpreted that expression to require diligent protection of the public's right of access to agency proceedings" (internal quotation marks omitted)).

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

This case illustrates the inherent tension between the competing public policy objectives of governmental transparency and patient confidentiality. "From the beginning, the history of [FOIA] has been one of tension between the principle of open government and those circumstances [in which] superior public interest requires confidentiality." (Internal quotation marks omitted.) M. Burke, "The Freedom of Information Act and Its Exceptions," 91 Conn. B.J. 350, 366 (2018). We acknowledge "the unfortunate reality that a stigma may attach to one who seeks psychiatric care . . . and that revealing a patient's identity may subject him or her to embarrassment, harassment or discrimination." *Falco* v. *Institute of Living*, supra, 254 Conn. 329. We agree with our dissenting colleagues that this is a concern worthy of very serious consideration. On the other hand, however, we must also acknowledge the unfortunate and undeniable reality that governmental secrecy can be used to conceal governmental abuse, corruption, and neglect. Cf. *National Labor Relations Board* v. *Robbins Tire & Rubber Co.*, 437 U.S. 214, 242, 98 S. Ct. 2311, 57 L. Ed. 2d 159 (1978) ("[t]he basic purpose of [the federal Freedom of Information Act] is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed").[16] In enacting FOIA, the legislature balanced these competing principles and provided, as it deemed appropriate, for certain exemptions from disclosure to protect patient confidentiality. For example, there is a specific FOIA exemption for "medical files and similar files the disclosure of which would constitute an invasion of

---

[16] Like the federal Freedom of Information Act; see 5 U.S.C. § 552 (2018); our state FOIA was enacted "in the aftermath of the Vietnam War and Watergate . . . [when] people were fed up with furtive government" and had "los[t] faith in government and politicians." M. Burke, supra, 91 Conn. B.J. 350. As we previously have recognized, "the purposes of the federal act and of our act are virtually identical . . . ." (Citations omitted.) *Board of Trustees* v. *Freedom of Information Commission*, 181 Conn. 544, 553, 436 A.2d 266 (1980).

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

personal privacy''; General Statutes § 1-210 (b) (2); which is not at issue in this appeal. See footnote 4 of this opinion. There also is an exemption for records that "may result in a safety risk, including the risk of harm to any person or the risk of an escape from, or a disorder in, a . . . facility under the supervision of . . . Whiting Forensic Hospital.'' General Statutes § 1-210 (b) (18).[17] Most notably for present purposes, however, FOIA does not contain a blanket exemption from disclosure for all records and documents relating to patients at Whiting or other public mental health facilities, and we cannot expand the statutory privilege by construction, even if we believed that the relevant considerations warrant broader coverage. See *Commissioner of Public Safety* v. *Freedom of Information Commission*, 312 Conn. 513, 550, 93 A.3d 1142 (2014) ("we deem balancing the various interests and articulating a coherent policy on [FOIA exemptions] to be a uniquely legislative function''); *State* v. *Whiteman*, 204 Conn. 98, 103, 526 A.2d 869 (1987) ("[i]n areas [in which] the legislature has spoken . . . the primary responsibility for formulating public policy must remain with the legislature''). The decision whether the public policy of this state would best be served by creating such an exemption to protect the confidentiality of patient information, or by requiring the disclosure of such information to ensure governmental accountability for the proper care and maintenance of mental health patients, who are some of the most vulnerable members of our population, is one that rests with the legislature.

2

Substantial Evidence To Support
the Commission's Decision

We next address whether there is substantial evidence in the administrative record to support the com-

---

[17] This exemption, which mentions Whiting by name, reflects the legislature's awareness of the need to modify FOIA's disclosure requirements to accommodate the needs of Whiting and its patient population.

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

mission's finding that the police report is not a communication or record thereof, as defined by § 52-146d (2). "An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . The United States Supreme Court, in defining substantial evidence in the directed verdict formulation, has said that it is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (Internal quotation marks omitted.) *Stratford Police Dept.* v. *Board of Firearms Permit Examiners*, 343 Conn. 62, 81, 272 A.3d 639 (2022). The substantial evidence standard requires courts to defer to agency findings in the absence of a strong reason to intervene: "[I]t is [not] the function of the trial court [or] of this court to retry the case or to substitute its judgment for that of the administrative agency. . . . The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion." (Citation omitted; internal quotation marks omitted.) *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection*, 253 Conn. 661, 668–69, 757 A.2d 1 (2000), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001).

As we explained previously, the evidence adduced at the administrative hearing consisted of the testimony of Lejardi and the police report in both redacted and unredacted form. Our in camera review of the police

347 Conn. 675　　　AUGUST, 2023　　　709

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

report reveals that it is a collection of investigative reports, each typewritten on a standard form entitled "POLICE CASE/INCIDENT REPORT" and authored by various members of the DMHAS Police Department as part of its investigation into a patient's death. Ten of these reports were written by the DMHAS police officer primarily assigned to investigate the matter, Detective Thomas M. Ruggerio, who was not present at the time of the underlying events. Ruggerio's reports, which comprise thirty of the report's forty-one pages, include his narrative of witness interviews conducted by him, as well as timelines and narratives created by him upon review of video and audio recordings of some of the relevant events.[18] The other five reports were written by other DMHAS police officers.[19] A few of the reports were created within twenty-four hours after the patient's death. Most of them were created over the next eight days. There are two later reports, dated March 31, 2017, and April 26, 2017, which document Ruggerio's release of the complete narrative of the investigation, video footage, photographs and related information to the state police, Ruggerio's receipt of the medical examiner's autopsy report, and the closure of the investigation.[20]

Having reviewed Lejardi's testimony and the police report in camera, we conclude that substantial evidence

---

[18] The incident reports contain Ruggerio's narrative of interviews with seven members of the hospital staff and one patient who witnessed some of the event.

[19] Two of the incident reports contain the respective officers' narrative describing their own on scene observations of the medical incident.

[20] The police report references other documents and information either created or reviewed by the DMHAS police officers in the course of their investigation, including video footage of the event under investigation from cameras located at various locations within the hospital, photographs of the scene taken by the DMHAS police, and the autopsy report of the patient produced by the medical examiner. The police report indicates that, prior to providing information to the state police, DMHAS obtained from all of the patients who appeared in the video footage releases authorizing the disclosure of their protected health related information. This is the only reference in the police report to the subject of patient confidentiality.

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

supports the commission's determination that the report
is not a communication or record thereof, as defined
by § 52-146d (2). The police report, which was gener-
ated after the death of a patient at Whiting, is not a
communication "between the patient and a psychiatric
mental health provider, or between a member of the
patient's family and a psychiatric mental health pro-
vider, or between any of such persons and a person
participating under the supervision of a psychiatric
mental health provider in the accomplishment of the
objectives of diagnosis and treatment . . . ." General
Statutes § 52-146d (2). Instead, it is a communication
between the DMHAS police officers tasked with investi-
gating a patient's death and an unknown recipient or
recipients. Regardless of whether the intended recipient
was the captain of the DMHAS police force, the state
police, or, more speculatively, a "psychiatric mental
health provider," as defined by § 52-146d (7),[21] given
the death of the patient who is the subject of the report,
it clearly appears that the officers were not participating
in the accomplishment of the objectives of diagnosis
and treatment at the time the report was produced.
Rather, the DMHAS police officers were performing the
traditional law enforcement function of investigating
an unnatural death and reporting the results of their
investigation. On the present administrative record, we
cannot conclude that the commission acted arbitrarily,
illegally, or in abuse of its discretion in finding that the
police report was not a communication or record within
the meaning of the statutory scheme.

[21] There is no evidence in the record that the intended recipient was a
"psychiatric mental health provider," a term defined by statute as "a physi-
cian specializing in psychiatry and licensed under the provisions of sections
20-9 to 20-12, inclusive, an advanced practice registered nurse licensed under
chapter 378 who is board certified as a psychiatric mental health provider
by the American Nurses Credentialing Center, a person licensed to practice
medicine who devotes a substantial portion of his or her time to the practice
of psychiatry or a person reasonably believed by the patient to be so quali-
fied." General Statutes § 52-146d (7).

In their respective opinions, Chief Justice Robinson and Justice Keller arrive at the opposite conclusion on the basis of their review of the administrative record. Specifically, they would find that the DMHAS police officers who responded to the emergency medical event suffered by the patient on December 1, 2016, were participating "in the accomplishment of the objectives of diagnosis and treatment" within the meaning of § 52-146d (2). See, e.g., part I of the dissenting opinion. That conclusion is flawed for three reasons. First, the proper focus of the privilege inquiry for present purposes is the police report itself, because that is the communication or record thereof at issue. We have seen nothing in the record supporting (much less compelling) the conclusion that the DMHAS officers were participating in the accomplishment of the objectives of diagnosis and treatment at the time they wrote the report.

Second, turning from the authors of the report to its intended recipient, we reiterate that a document does not qualify as a communication or record thereof within the meaning of § 52-146d (2) unless the intended recipient of the communication also falls within one of the three protected categories of communicants identified therein. As we previously explained, there is no evidence in the record indicating the intended recipient of the police report, and, without such evidence, we are unable to discern any basis for the assertions in the dissenting opinions that the police report is a communication or record thereof.

Third, although some DMHAS police officers responded to the emergency medical event involving the patient, it is unclear from the record whether, as Chief Justice Robinson concludes, they were participating "in their capacity as part of the psychiatric treatment team" or, alternatively, performing the traditional law enforcement function of coordinating an emergency response to a medical event. As Chief Justice Robinson acknowl-

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

edges, "no officer provided emergency medical treatment to the patient . . . ." Indeed, there is no evidence to suggest that the responding officers had any physical or verbal interaction of any kind with the patient. Given the ambiguity in the administrative record, we are not at liberty to substitute our own judgment for that of the commission.

To be clear, we do not suggest, as Justice Keller implies, that the police report does not "relat[e] to diagnosis or treatment of a patient's mental condition" within the meaning of § 52-146d (2). (Internal quotation marks omitted.) Part I of the dissenting opinion. It clearly does. Rather, we hold that the police report at issue in this case is not a protected psychiatrist-patient communication or a record of such a communication between the patient, a member of the patient's family, or a mental health provider and "a person *participating . . . in the accomplishment of the objectives of diagnosis and treatment* . . . ." (Emphasis added.) General Statutes § 52-146d (2). Although the police report contains information related to the patient's psychiatric diagnosis and treatment, at the time the police report was generated, the DMHAS police officers were not participating in the diagnosis and treatment of the patient but, instead, were participating in an investigation into the cause of the patient's untimely death and the adequacy of DMHAS' response to the patient's emergency medical event.[22]

_____

[22] Justice Keller concludes that individuals in the third category of communicants need not "participate in diagnosis or treatment directly" and that it is enough that their role "is one that serves the accomplishment of the objectives of diagnosis and treatment . . . ." (Internal quotation marks omitted.) Part I of the dissenting opinion. This construction of § 52-146d (2) reads the word "participating" out of the statutory definition, contrary to our well established rules of statutory construction. See, e.g., *Vibert* v. *Board of Education*, 260 Conn. 167, 176, 793 A.2d 1076 (2002) ("[e]very word and phrase is presumed to have meaning, and we do not construe statutes so as to render certain words and phrases surplusage" (internal quotation marks omitted)).

347 Conn. 675 AUGUST, 2023 713

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

In reaching this conclusion, we are fully cognizant that, even though the police report itself is not a privileged psychiatrist-patient communication, it might contain the substance, part, or resume of some discrete, privileged, psychiatrist-patient communications between the individuals identified in the three categories of communicants delineated in § 52-146d (2). As Justice Keller correctly points out in her dissenting opinion, all allegedly privileged psychiatrist-patient communications contained in documents "must be evaluated on two levels": (1) whether the document itself is a protected communication or record thereof, as defined by the statutory scheme, and (2) if not, whether it memorializes communications between any of the three sets of communicants within the statutory definition. Part I of the dissenting opinion. With respect to this second level analysis, Justice Keller concludes that the police report memorializes some privileged, premortem "communications among mental health staff and between mental health staff and the patient." Id. Whatever the validity of this observation, however, DMHAS did not raise this claim before the commission or the trial court. Nor has DMHAS raised this claim on appeal. Indeed, DMHAS never asked the commission, the trial court, or this court to redact any of the alleged second level, privileged communications identified by Justice Keller. Given that this claim is not preserved for our review or presented to us on appeal, we decline to address it. See, e.g., *State* v. *Connor*, 321 Conn. 350, 362, 138 A.3d 265 (2016) ("Our appellate courts generally do not consider issues that were not raised by the parties. . . . This is because our system is an adversarial one in which the burden ordinarily is on the parties to frame the issues . . . ." (Citation omitted; internal quotation marks omitted.)).

For the foregoing reasons, we conclude that the police report is not privileged under §§ 52-146d (2) and

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

52-146e (a).[23] Nonetheless, we note that the police report
contains sensitive information regarding the identity of
two mental health patients, which DMHAS consistently
has sought to redact throughout this litigation. Specifi-
cally, the report contains the name, date of birth, and
home phone number of the patient whose death was
under investigation, as well as the same information
regarding a second patient who witnessed the medical
event that led to the first patient's death. Kovner, how-
ever, never requested any patient identifying informa-
tion under FOIA. Indeed, Kovner explicitly qualified his
public records request by stating that "[a]ll references
to the identity of a patient can be redacted." Given that
patient identifying information was not requested, the
commission erred in ordering the disclosure of this
information over the objection of DMHAS.[24] Accord-
ingly, all references to patient names, dates of birth,
and home phone numbers must be redacted.

---

[23] Because the police report is not a protected psychiatrist-patient commu-
nication or record thereof under §§ 52-146d (2) and 52-146e (a), we do not
address whether it will "identify a patient" or render a patient "identifiable"
within the meaning of § 52-146d (4). See General Statutes § 52-146d (4)
(" '[i]dentifiable' and 'identify a patient' refer to *communications and
records which contain* (A) names or other descriptive data from which a
person acquainted with the patient might reasonably recognize the patient
as the person referred to, or (B) codes or numbers which are in general
use outside of the mental health facility which prepared the communications
and records" (emphasis added)). We also do not address whether, on differ-
ent facts, a communication or record thereof created after the death of a
patient might fall within the protection of § 52-146e (a). See part I of the
dissenting opinion.

[24] Contrary to Justice Keller's contention, we do not suggest that "the
redaction of the patient's name is somehow sufficient to safeguard the
patient's privilege . . . ." Part II of the dissenting opinion. We hold, rather,
that the police report is not privileged and that there is no claim before us
that the report memorializes or summarizes discrete, premortem, privileged
communications between any of the individuals identified in the three cate-
gories of communicants delineated in § 52-146d (2). The names, dates of
birth, and home phone numbers of the patients must be redacted because
this information was not requested under FOIA and, therefore, is not required
to be disclosed under the statutory scheme.

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

B

HIPAA

Having determined that the police report must be disclosed pursuant to FOIA, we must address whether it is nonetheless protected from disclosure "as otherwise provided by any federal law . . . ." General Statutes § 1-210 (a). DMHAS claims that the police report is protected from disclosure by HIPAA, as implemented by the Privacy Rule, because DMHAS is a "covered entity" and the report contains protected "health information" under 45 C.F.R. § 160.103.

FOIA "expressly exempts from the act any information that is protected from disclosure under federal law." *Commissioner of Correction* v. *Freedom of Information Commission*, supra, 307 Conn. 81; see General Statutes § 1-210 (a). HIPAA's Privacy Rule generally prohibits a "covered entity" from using or disclosing protected "health information" without a valid authorization. 45 C.F.R. § 164.508 (a) (1) (2021). Health plans, health care clearinghouses, and health care providers are covered entities. Id., § 160.103. "Health information" is "any information . . . that: (1) Is created or received by a health care provider, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse; and (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual." Id.

There are various exemptions pursuant to which a covered entity may disclose protected health information under HIPAA without a valid authorization. See id., § 164.512. Pertinent to the present appeal, "[a] covered entity may use or disclose protected health information *to the extent that such use or disclosure is required by law and the use or disclosure complies with and*

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

*is limited to the relevant requirements of such law.*"
(Emphasis added.) Id., § 164.512 (a) (1). "*Required by
law* means a mandate contained in law that compels
an entity to make a use or disclosure of protected health
information and that is enforceable in a court of law.
*Required by law* includes, but is not limited to, court
orders and court-ordered warrants; subpoenas or sum-
mons issued by a court, grand jury, a governmental
or tribal inspector general, or *an administrative body
authorized to require the production of information
. . .* and *statutes* or *regulations that require the pro-
duction of information . . . .*" (Emphasis altered.)
Id., § 164.103.

FOIA is a state statute that requires the production
of public records, and, therefore, health information is
not protected by HIPAA if its disclosure is required by
FOIA. As the commentary to the Privacy Rule states:
"These rules permit covered entities to make disclo-
sures that are required by state [f]reedom of [i]nforma-
tion . . . laws under § 164.512 (a). Thus, if a state
[freedom of information] law designates death records
and autopsy reports as public information that must be
disclosed, a covered entity may disclose it without an
authorization under the rule. To the extent that such
information is required to be disclosed by [freedom of
information laws] or other law[s], such disclosures are
permitted under the final rule." Standards for Privacy
of Individually Identifiable Health Information, 65 Fed.
Reg. 82,462, 82,597 (December 28, 2000); see id.,
82,666–67 (Section 164.512 (a) "permits covered entities
to use or disclose protected health information when
they are required by law to do so. . . . [W]e intend this
provision to preserve access to information considered
important enough by state or federal authorities to
require its disclosure by law.").[25]

[25] Our sister state courts uniformly have determined that public records
required to be disclosed under state freedom of information laws are not
protected from disclosure by HIPAA, even if they were produced by a

347 Conn. 675 AUGUST, 2023 717

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

Even if we assume, without deciding, that the DMHAS Police Department is a "covered entity" and that the police report contains "health information," as defined by the Privacy Rule, the police report nonetheless is not protected from disclosure under HIPAA because its release is "required by law" under FOIA.[26] 45 C.F.R. § 164.512 (a) (2021); see part III A of this opinion. We therefore conclude that the police report must be disclosed, provided that the names, dates of birth, and home phone numbers of the two patients mentioned therein are redacted.

The judgment is reversed in part and the case is remanded with direction to reverse in part the decision of the commission and to order the release of a version of the police report that redacts only the names, dates of birth, and home phone numbers of the patients referred to therein; the judgment is affirmed in all other respects.

"covered entity" and contain "health information . . . ." 45 C.F.R. § 164.508 (a) (1) (2021); see *State ex rel. Adams County Historical Society* v. *Kinyoun*, 277 Neb. 749, 756, 765 N.W.2d 212 (2009) (burial records were not protected by HIPAA because they were required to be disclosed under Nebraska's public records law, and "HIPAA can and does give way to state laws requiring disclosure of certain kinds of information"); *State ex rel. Cincinnati Enquirer* v. *Daniels*, 108 Ohio St. 3d 518, 526, 844 N.E.2d 1181 (2006) (concluding that public record subject to disclosure under Ohio Public Records Law was not protected by HIPAA, "even if . . . [it] did contain 'protected health information' as defined by HIPAA, and even if the [public agency] operated as a 'covered entity' pursuant to HIPAA"); *Oregon Health & Science University* v. *Oregonian Publishing Co., LLC*, 362 Or. 68, 86, 403 P.3d 732 (2017) ("[f]ollowing the guidance provided in the Privacy Rule commentary, a covered entity responding to a public records request often could comply with both HIPAA and a law requiring disclosure of public records . . . under HIPAA's 'required by law' exception"); *Abbott* v. *Dept. of Mental Health & Mental Retardation*, 212 S.W.3d 648, 660 (Tex. App. 2006) (statistics regarding allegations of patient abuse at Texas state facilities were not protected from disclosure by HIPAA because Texas' "Public Information Act is a statute requiring the disclosure of protected health information as described in [§] 164.512 (a) of the Privacy Rule").

[26] During oral argument before this court, counsel for DMHAS conceded that, if the police report must be disclosed by FOIA, then it is not protected from disclosure by HIPAA.

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

In this opinion McDONALD, MULLINS and CRADLE, Js., concurred.

ROBINSON, C. J., concurring in part and dissenting in part. I respectfully disagree with part III A of the majority opinion, in which the majority concludes that the police case/incident report (police report) created by the police department of the plaintiff Department of Mental Health and Addiction Services (DMHAS) does not fall within the definition of "communications and records," as used in the psychiatrist-patient privilege statute, General Statutes § 52-146e (a),[1] which would exempt it from disclosure under the Freedom of Information Act (FOIA), General Statutes § 1-200 et seq. Instead, guided by our recent decision in the "Arsenic and Old Lace" case, *Freedom of Information Officer, Dept. of Mental Health & Addiction Services* v. *Freedom of Information Commission*, 318 Conn. 769, 771, 122 A.3d 1217 (2015), I conclude that the police report in the present case consists of written documentation by DMHAS police officers and oral statements made by staff members and responding officers at the Whiting Forensic Division of Connecticut Valley Hospital (Whiting), arising out of and relating to a mental health incident that occurred during a patient's treatment, and is thus a "record" of such communications, as defined by General Statutes § 52-146d (2).[2] Unlike the majority, I

---

[1] General Statutes § 52-146e (a) provides: "All communications and records as defined in section 52-146d shall be confidential and shall be subject to the provisions of sections 52-146d to 52-146j, inclusive. Except as provided in sections 52-146f to 52-146i, inclusive, no person may disclose or transmit any communications and records or the substance or any part or any resume thereof which identify a patient to any person, corporation or governmental agency without the consent of the patient or his authorized representative."

[2] General Statutes § 52-146d (2) provides: " 'Communications and records' means all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatric mental health provider, or between a member of the patient's family and a psychiatric mental health provider, or between any of such persons and a person participating under the supervision of a psychi-

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

would order the redaction of the deceased patient's psychiatric diagnosis, in addition to the names, addresses, and phone numbers of the two patients referenced in the police report. Because I nevertheless conclude that disclosure of the police report in redacted form is required by law pursuant to FOIA, I also conclude that it is not subject to the nondisclosure provisions of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. § 1320d et seq., as implemented by the Privacy Rule, 45 C.F.R. § 160.101 et seq. See General Statutes § 1-210 (a).[3] Accordingly, I respectfully dissent in part.

I note my agreement with the majority's recitation of the facts, procedural history, and governing legal principles, as set forth by, among other authorities, *Freedom of Information Officer, Dept. of Mental Health & Addiction Services* v. *Freedom of Information Commission*, supra, 318 Conn. 769, and General Statutes § 1-2z. See parts I and II of the majority opinion. I also agree with the majority's conclusion that the phrase in § 52-146d (2), "wherever made, including communications and records which occur in or are prepared at a mental health facility," does *not* include *all* communications and records of communications created in a

atric mental health provider in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility . . . ."

Although § 52-146d was the subject of technical amendments in 2019; see Public Acts 2019, No. 19-98, § 24; those amendments have no bearing on the merits of this appeal. I refer to the current revision of the statute in the interest of simplicity.

[3] General Statutes § 1-210 (a) provides in relevant part: "(a) Except as otherwise provided by any federal law or state statute, all records maintained or kept on file by any public agency, whether or not such records are required by any law or by any rule or regulation, shall be public records and every person shall have the right to (1) inspect such records promptly during regular office or business hours, (2) copy such records in accordance with subsection (g) of section 1-212, or (3) receive a copy of such records in accordance with section 1-212. . . ."

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

mental health facility, regardless of between whom they are made. See part III A 1 of the majority opinion. I write separately because I believe that our recent interpretation of the term "communications and records" in *Freedom of Information Officer, Dept. of Mental Health & Addiction Services* v. *Freedom of Information Commission*, supra, 786–91 and n.8, is dispositive as to whether the police report in question falls within the ambit of § 52-146d (2). See, e.g., *State* v. *Lopez*, 341 Conn. 793, 802, 268 A.3d 67 (2022) ("[w]e have previously construed the meaning of the [statutory] phrase . . . and are guided by that precedent"); *Boardwalk Realty Associates, LLC* v. *M & S Gateway Associates, LLC*, 340 Conn. 115, 126, 263 A.3d 87 (2021) ("[i]n construing [the statute], we do not write on a clean slate, but are bound by our previous judicial interpretations of this language and the purpose of the statute" (internal quotation marks omitted)).

At the outset, I emphasize that records produced by a state mental health institution's police department reflect a unique tension between two important interests, namely, the protection of patient privacy under the psychiatrist-patient privilege and ensuring government transparency under FOIA. On the one hand, the psychiatrist-patient privilege's purpose is to safeguard confidential communications and records of a patient seeking diagnosis and treatment to protect the therapeutic relationship. See, e.g., *State* v. *White*, 169 Conn. 223, 234–35, 363 A.2d 143 (principal purpose of privilege is to give patient incentive to make full disclosure to physician to obtain effective treatment free from embarrassment and invasion of privacy), cert. denied, 423 U.S. 1025, 96 S. Ct. 469, 46 L. Ed. 2d 399 (1975); see also *Falco* v. *Institute of Living*, 254 Conn. 321, 328–29, 757 A.2d 571 (2000) (protection of communications that identify patient is "central" to purpose of statute). On the other hand, the core legislative policy of FOIA is

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

"one that favors the open conduct of government and free public access to government records." (Internal quotation marks omitted.) *Meriden* v. *Freedom of Information Commission*, 338 Conn. 310, 321, 258 A.3d 1 (2021); see, e.g., *Director, Retirement & Benefits Services Division* v. *Freedom of Information Commission*, 256 Conn. 764, 772–73, 775 A.2d 981 (2001) (court interprets exemptions to act narrowly considering "[the] overarching policy underlying [FOIA] favoring the disclosure of public records" (internal quotation marks omitted)). Thus, competing considerations between protecting patient confidentiality and favoring the disclosure of public records require us to apply the psychiatric-patient privilege "cautiously and with circumspection" to achieve the proper balance between the rights to personal privacy and to inspect government records. (Internal quotation marks omitted.) *State* v. *Montgomery*, 254 Conn. 694, 724, 759 A.2d 995 (2000).

Our recent decision in the Arsenic and Old Lace case, *Freedom of Information Officer, Dept. of Mental Health & Addiction Services* v. *Freedom of Information Commission*, supra, 318 Conn. 769, interpreted the phrase in § 52-146d (2), " 'between any of such persons and a person participating under the supervision of a psychiatrist in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility,' " and concluded that the medical and dental records contained in a deceased patient's file fell within its purview. Id., 783. In that case, the Freedom of Information Commission (commission) argued that there was no distinction between documents related to psychiatric care and those related to medical treatment at a mental health facility for purposes of the psychiatrist-patient privilege. Id., 780. We agreed because "all of the documents at issue were created during care for a patient at an

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

inpatient mental health facility . . . .’’ Id. We also
deemed certain *administrative documents privileged*
‘‘because they contain[ed] identifying information and
information related to [the patient’s] diagnosis.’’ Id.,
789 n.8.

Additionally, we recognized that General Statutes
§ 17a-545, which requires inpatient mental health facili-
ties to conduct physical examinations of patients,
reflects a legislative judgment that ‘‘mental health con-
ditions are often related to physical disorders and that
the proper treatment of mental health involves the treat-
ment of physical issues, as well.’’ Id., 790–91. Although,
as the majority points out, the definition of ‘‘communi-
cations and records’’ was not at issue in *Falco* v. *Insti-*
*tute of Living*, supra, 254 Conn. 321; see part III A 1 of
the majority opinion; we nevertheless relied on that
case for the proposition that the legislative purpose
behind the psychiatrist-patient privilege recognizes
‘‘ ‘that a stigma may attach to one who seeks psychiatric
care, and that revealing a patient’s identity may subject
[the individual] to embarrassment, harassment or dis-
crimination.’ ’’ *Freedom of Information Officer, Dept.*
*of Mental Health & Addiction Services* v. *Freedom of*
*Information Commission*, supra, 318 Conn. 787 n.8,
quoting *Falco* v. *Institute of Living*, supra, 329. We
likewise ‘‘refuse[d] to interpret the psychiatrist-patient
privilege in such a manner so as to thwart mental health
treatment in this state at a time when society is seeing
the ever increasing need for individuals to seek out and
receive mental health treatment.’’ *Freedom of Informa-*
*tion Officer, Dept. of Mental Health & Addiction Ser-*
*vices* v. *Freedom of Information Commission*, supra,
786 n.8. Ultimately, this court’s ‘‘understanding of the
broad veil of secrecy created by the psychiatrist-patient
privilege’’; id., 791; supported our conclusion that, although
not communications directly between a patient or fam-
ily member and a *psychiatrist*, the medical and dental

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

records in the Arsenic and Old Lace case satisfied the
statutory definition of "communications and records" in
§ 52-146d (2) because there was evidence "that the medical
and dental records at issue were created at the hospital
during [the patient's] inpatient treatment," were related
to the objectives of the patient's diagnosis and treat-
ment, and were made "under the direction of a psychia-
trist," who was "the superintendent of the facility at the
time [the patient]" was receiving treatment. Id., 785–86.

This court also has generally interpreted the psychia-
trist-patient "privilege broadly and its exceptions nar-
rowly." *State* v. *Fay*, 326 Conn. 742, 751, 167 A.3d 897
(2017); see *State* v. *Jenkins*, 73 Conn. App. 150, 162, 807
A.2d 485 (2002) (all information in nursing assessment
conducted under supervision of psychiatrist, "*even the
biographical data*, [was] used . . . to gather informa-
tion about mental health issues" and, thus, was "a men-
tal health record" (emphasis added; internal quotation
marks omitted)), rev'd in part on other grounds, 271
Conn. 165, 856 A.2d 383 (2004). It is well established
that "[t]he people of this state enjoy a broad privilege in
the confidentiality of their psychiatric communications
and records . . . ." (Internal quotation marks omitted.)
*Freedom of Information Officer, Dept. of Mental
Health & Addiction Services* v. *Freedom of Information
Commission*, supra, 318 Conn. 784. This court repeat-
edly has recognized that the psychiatrist-patient "privi-
lege covers not only communications between the patient
and [the] psychiatrist, but also all communications relating
to the patient's mental condition between the patient's
family and the psychiatrist and his *staff and employees,
as well as records and communications prepared at
mental health facilities*." (Emphasis added; internal
quotation marks omitted.) *State* v. *Kelly*, 208 Conn. 365,
379, 545 A.2d 1048 (1988); see *Freedom of Information
Officer, Dept. of Mental Health & Addiction Services*

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

v. *Freedom of Information Commission*, supra, 786
n.8; see also General Statutes § 52-146d (2).

Turning to the record in this case, I observe that it
is undisputed that, although members of the DMHAS
police department perform traditional law enforcement
functions,[4] they are also specially trained to work with
patients and mental health care providers at Whiting.
See Public Safety Division, Dept. of Mental Health &
Addiction Services, DMHAS Police, available at https://
portal.ct.gov/DMHAS/Divisions/Safety-Services/DSS-Public-
Safety-Police (last visited August 25, 2023). DMHAS police
officers regularly interact with Whiting patients and
are familiar with, among other things, their behaviors,
reasons for admission to the facility, and psychiatric
symptom triggers, as well as de-escalation techniques.
The record indicates that DMHAS police officers may
use that specialized training in connection with a police
intervention at Whiting, and my own in camera review
of the police report at issue reveals that DMHAS police
officers, in responding to a "code" alarm activated at
a nurse's station, acted in their capacity as part of the
psychiatric treatment team, rather than in a purely law
enforcement capacity. In fact, consistent with their role
at DMHAS facilities, and unlike the responding nurses
and emergency medical personnel, no officer provided
emergency medical treatment to the patient upon arrival.
Moreover, Whiting's superintendent, with overall super-
visory responsibility over operations at that facility, was
a forensic psychiatrist at the time that the incident
occurred and the record was created. See *Freedom of*

---

[4] The DMHAS police department provides "quality services through tradi-
tional law enforcement functions and safety and security management activi-
ties which are critical to maintaining compliance required for the Joint
Commission on Accreditation of Healthcare Organizations . . . and other
regulatory entities . . . ." Public Safety Division, Dept. of Mental Health &
Addiction Services, DMHAS Police, available at https://portal.ct.gov/DMHAS/
Divisions/Safety-Services/DSS--Public-Safety-Police (last visited August 25,
2023).

347 Conn. 675        AUGUST, 2023              725

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

*Information Officer, Dept. of Mental Health & Addiction Services* v. *Freedom of Information Commission,* supra, 318 Conn. 785–86 (relying on fact that superintendent of inpatient facility during patient's treatment was psychiatrist in concluding that privilege extended to records pertaining purely to medical care).

Therefore, I conclude that the police report was created by the DMHAS police officers who acted in conjunction with and as part of the psychiatric treatment staff. I also conclude that the police report relates to the diagnosis or treatment of a patient's mental condition because it documents statements and writings that divulge the patient's diagnosis and the occurrence of a mental health incident during psychiatric treatment. Accordingly, because the police report in this case consists of written testimonials by DMHAS police officers documenting oral statements made by the hospital staff members, responding officers, and another patient, arising out of and relating to the mental health incident of a patient during treatment, I conclude that it is a "record" of such communications made between persons participating under the supervision of a psychiatric mental health provider pursuant to § 52-146d (2). The commission's determination otherwise is not supported by substantial evidence in the record and is a clear error of law.

Although we held in *Freedom of Information Officer, Dept. of Mental Health & Addiction Services* v. *Freedom of Information Commission,* supra, 318 Conn. 769, that all medical and dental records, including administrative records, contained in a patient's file were privileged "communications and records"; see id., 786; see also id., 796 (*McDonald, J.,* concurring in part and dissenting in part); I emphasize that I do not believe that all police reports created by the DMHAS police department fall within the scope of § 52-146d (2). The broad veil of confidentiality the law recognizes by the psychiatrist-patient privilege, although intended to protect the privacy of patients

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

undergoing psychiatric treatment, may well be used improperly to conceal alleged abuse and other physical and psychological harms in psychiatric institutions. See M. Shields et al., "Patient Safety in Inpatient Psychiatry: A Remaining Frontier for Health Policy," 37 Health Aff. 1853, 1853–54, 1858 (2018).

Because I conclude that the police report does not fall within the "communications and records" protected by the psychiatrist-patient privilege, I next reach the issue of whether a redacted version of the police report can be disclosed without violating the privilege, and, more specifically, whether the trial court had the authority to order the disclosure of the police report with redactions pursuant to FOIA.

Pursuant to FOIA, all nonprivileged "records maintained or kept on file by any public agency . . . shall be public records . . . ." General Statutes § 1-210 (a); see footnote 3 of this opinion. Section 52-146e (a), however, provides in relevant part that "no person may disclose or transmit any communications and records or the substance or any part or any resume thereof which identify a patient to any person, corporation or governmental agency without the consent of the patient or his authorized representative." Although communications bearing "no relationship to the purpose for which the privilege was enacted do not obtain shelter under the statute and are" otherwise subject to disclosure, we have acknowledged that shielding the identity of psychiatric facility patients is "central to the purpose of the statute." (Internal quotation marks omitted.) *Freedom of Information Officer, Dept. of Mental Health & Addiction Services* v. *Freedom of Information Commission*, supra, 318 Conn. 784. Thus, this court has agreed with the proposition that state agencies have discretion, under some circumstances, to redact information exempt from public disclosure when complying with FOIA. See *Pictometry International Corp.* v. *Free-*

*dom of Information Commission*, 307 Conn. 648, 663, 59 A.3d 172 (2013).

Section 52-146d (4) explains that communications and records " 'identify a patient' " when they contain "names or other descriptive data from which a person acquainted with the patient might reasonably recognize the patient as the person referred to, or . . . codes or numbers which are in general use outside of the mental health facility which prepared the communications and records . . . ." Information that identifies a patient includes, inter alia, names, last known addresses, social security numbers, and zip codes. See *Falco* v. *Institute of Living*, supra, 254 Conn. 323; *Connecticut State Medical Society* v. *Commission on Hospitals & Health Care*, 223 Conn. 450, 459, 612 A.2d 1217 (1992). Our case law instructs us to apply this framework objectively because "interpreting the psychiatrist-patient privilege in light of what the public may or may not know about the person or his or her medical history is a dangerous proposition not authorized by statute. As this court stated in *Falco* [v. *Institute of Living*, supra, 331], 'it is contrary to the language of the statute and the intent of the legislature for courts to make discretionary case-by-case determinations of when the privilege may be overridden.' " *Freedom of Information Officer, Dept. of Mental Health & Addiction Services* v. *Freedom of Information Commission*, supra, 318 Conn. 789 n.8. Therefore, I look only to the four corners of the police report to determine whether it identifies a patient, rather than considering information therein in conjunction with other information already available to the public.

My in camera review of the unredacted police report reveals that it contains, among other things, the patient's name, another patient's name, the patient's psychiatric condition, and the patient's physical condition at the time of the incident. It also includes descriptions of

728 AUGUST, 2023 347 Conn. 675

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

emergency medical care that was rendered to the patient
by Whiting staff and other emergency medical providers.
Although the majority concludes that, simply because
the FOIA request "stat[ed] that '[a]ll references to the
identity of a patient can be redacted,' " the patients' names,
birthdates, and home phone numbers in the police
report must be redacted; part III A 2 of the majority
opinion; I would further direct that the patient's psychi-
atric diagnosis be redacted before the police report is
disclosed. Considering the nature of this particular police
report, the use of redactions to eliminate all references
to the patient's name and other identifying information,
including information relating to the patients' psychiatric
diagnosis, not only appropriately balances patient confi-
dentiality with the need for institutional transparency and
the purposes of FOIA, but also complies with the de-
identification procedure for disclosure under §§ 52-146d
(4) and 52-146e (a).[5] See *Freedom of Information Officer,*

_____

[5] I acknowledge that my conclusion with respect to redaction positions the
records of patients receiving psychiatric care in public institutions somewhat
differently from those receiving psychiatric care in private facilities. This
differential treatment, however, is consistent with our understanding of the
legislature's intent as we navigate the tensions inherent in the conflicting
relationship between §§ 1-210 and 52-146e (a). The trial court's order that
the redacted police report be disclosed is consistent with the plain language
of the statutes and the legislature's intent to "[allow] research and administra-
tion to proceed while safeguarding the confidentiality of the patient's com-
munications," by facilitating the transparency in the operation of state gov
ernment institutions that are subject to FOIA while ensuring that "identifiable
psychiatric data" receive similar protection in both public and private institu-
tions. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1969 Sess.,
p. 92, remarks of Ben Bursten, a psychiatrist; see id., remarks of Bursten
(observing that § 52-146d (2) "represents a delicate balance between the
patient's rights and the advantages offered by the new [computerized data
storage] technology"). I recognize this balance, cognizant of the legislative
prerogative with respect to the formulation of public policy. See, e.g., *Com-
mission on Human Rights & Opportunities* v. *Edge Fitness, LLC*, 342
Conn. 25, 42, 268 A.3d 630 (2022) ("we acknowledge that our analysis of
the plain and unambiguous statutory text . . . may lead to a result that
might well have been unintended by the legislature"); *Thibodeau* v. *Design
Group One Architects, LLC*, 260 Conn. 691, 715, 802 A.2d 731 (2002) ("we
are constrained to recognize the balance that the legislature has struck

347 Conn. 675      AUGUST, 2023      729

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

*Dept. of Mental Health & Addiction Services* v. *Freedom of Information Commission*, supra, 318 Conn. 772–74 (trial court partially redacted two documents *as to patient's diagnosis* but incorrectly concluded that all other records at issue could be disclosed under § 52-146e); id., 789–90 n.8 (correspondence from hospital superintendent to insurance company detailing patient's *diagnosis, psychiatric treatment, and mental state* was privileged); cf. *Chalmers* v. *Ormond*, Docket No. FST-CV11-6007918-S, 2012 WL 1592191, *3 (Conn. Super. April 17, 2012) (although psychiatric records could be disclosed to counsel for parties pursuant to 42 C.F.R. § 2.64 (e), court instructed plaintiffs' counsel to redact references to patients' *mental, physical, and nutritional condition*).

Nevertheless, because I agree with the majority that disclosure of the police report in a redacted form is required by law under HIPAA, I agree that it must disclose a redacted report, albeit to a greater extent than that ordered by the majority. Because I would direct judgment ordering the commission to disclose the police report redacting the patient's psychiatric diagnosis, in addition to the names, birthdates, and phone numbers of the patients in the police report, in accordance with §§ 52-146d (4) and 52-146e (a), I respectfully dissent in part.

KELLER, J., with whom D'AURIA, J., joins, dissenting. I disagree with the majority that the records at issue in this appeal, reports prepared by members of the police department of the plaintiff Department of Mental

between the state's dual interest in policing and eliminating sex discrimination in employment, on the one hand, and protecting small employers from the potentially heavy costs associated with defending against discrimination claims, on the other'').

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

Health and Addiction Services[1] (hospital police reports),
are not privileged pursuant to General Statutes § 52-146e
(a). My review of the hospital police reports reveals
that they contain precisely the type of information that
the legislature intended to protect through the psychia-
trist-patient privilege. The reports constitute communi-
cations and records thereof pursuant to § 52-146e (a),
and, because they identify two patients, including the
patient who is the subject of the reports, they are also
privileged identifying records, which may be disclosed
only if either the patient or the patient's authorized
representative consents to disclosure, or if one of the
statutory exceptions to the consent requirement in § 52-
146e (a) applies. Because no authorized representative
has consented to disclosure and no statutory exception
applies, disclosure is prohibited by § 52-146e (a).

The majority's conclusions to the contrary—that the
hospital police reports are not privileged communica-
tions or records thereof because they were prepared by
members of the plaintiff's police department (hospital
police) and that identifying records are not privileged
pursuant to § 52-146e (a)—create a two tiered system
for applying the psychiatrist-patient privilege. The legis-
lature has stated its intent to provide the same level of
protection to the psychiatric records of persons who
receive treatment from a public mental health institu-
tion as that afforded to the records of persons who
receive treatment from a private mental health care
provider. That intent is thwarted by the majority's nar-
row construction of § 52-146e (a). Under the majority's
rule, the communications and identifying records of
persons who receive private mental health care are
inviolate, but the statutory privilege of a person treated
in a public mental health facility is inferior. This is

---

[1] The Commissioner of Mental Health and Addiction Services is also a
plaintiff. In the interest of simplicity, I refer in this opinion to the Department
of Mental Health and Addiction Services as the plaintiff.

347 Conn. 675 AUGUST, 2023 731

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

especially true when the person being treated has engaged in self-harming behavior or behavior harmful to others that results in any intervention or investigation by the hospital police or some other provider of security in a public mental health institution. Given the likelihood that such reports are duplicative of records prepared by mental health staff documenting such incidents, the majority's rule allows members of the public who seek otherwise privileged records to circumvent the protections afforded to patients by the psychiatrist-patient privilege. Rather than requesting the records prepared by mental health staff, one need only seek the reports prepared by the hospital police. The majority's rule runs contrary to the legislature's intent to provide equal protection to those who receive treatment in public institutions and, because indigent persons are those most likely to turn to public institutions for treatment, provides the least protection to the most vulnerable among us.

Finally, because I conclude that the hospital police reports are privileged records not subject to disclosure pursuant to the Freedom of Information Act (FOIA), General Statutes § 1-200 et seq., I disagree with the majority's conclusion that the reports may be disclosed in redacted form pursuant to the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. § 1320d et seq., as implemented by the Privacy Rule, 45 C.F.R. § 160.101 et seq.

Accordingly, I respectfully dissent.

I

I disagree with the majority's conclusion that the determination of the named defendant, the Freedom of Information Commission (commission)—that the hospital police reports do not constitute communications or records for purposes of § 52-146e (a)—is supported

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

by substantial evidence.[2] The commission's determination, which rested primarily on the fact that the reports were prepared by members of the hospital police rather than by staff more directly involved in the provision of mental health care for the patients at the Whiting Forensic Division of Connecticut Valley Hospital (Whiting), cannot be reconciled with either the decisions of this court interpreting § 52-146e (a) or the testimony presented before the commission's hearing officer.

"According to our well established standards, [r]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts." (Internal quotation marks omitted.) *Stratford Police Dept.* v. *Board of Firearms Permit Examiners*, 343 Conn. 62, 81, 272 A.3d 639 (2022). As the majority explains, because the interpretations of the commission and the plaintiff are not entitled to deference, our review of § 52-146e (a) is de novo.

[2] General Statutes § 52-146e (a) provides: "All communications and records as defined in section 52-146d shall be confidential and shall be subject to the provisions of sections 52-146d to 52-146j, inclusive. Except as provided in sections 52-146f to 52-146i, inclusive, no person may disclose or transmit any communications and records or the substance or any part or any resume thereof which identify a patient to any person, corporation or governmental agency without the consent of the patient or his authorized representative."

347 Conn. 675    AUGUST, 2023    733

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

I agree with much of the majority's statutory construction of the first sentence of § 52-146e (a). The majority correctly concludes that the definition of "communications and records" in General Statutes § 52-146d (2)[3] clarifies that the first sentence of § 52-146e (a) protects only communications and records of communications. I also agree that such communications must "relat[e] to diagnosis or treatment of a patient's mental condition"; General Statutes § 52-146d (2); and that, pursuant to this court's decision in *Freedom of Information Officer, Dept. of Mental Health & Addiction Services* v. *Freedom of Information Commission*, 318 Conn. 769, 122 A.3d 1217 (2015) (*Freedom of Information Officer*), treatment of a patient's mental condition includes the provision of medical treatment. Id., 790–91. I also agree with the majority that records relate to the patient's diagnosis or treatment if the records are "connected by reason of an established or discoverable relation" to diagnosis or treatment. (Internal quotation marks omitted.) Finally, I agree that, pursuant to § 52-146d (2), "communications and records thereof" must be between one of three sets of communicants: the patient and a psychiatric mental health provider, a family member of the patient and a psychiatric mental health provider, or the patient, a family member or a psychiatric mental health provider and "a person partic-

[3] General Statutes § 52-146d (2) provides: " 'Communications and records' means all oral and written communications and records thereof relating to diagnosis or treatment of a patient's mental condition between the patient and a psychiatric mental health provider, or between a member of the patient's family and a psychiatric mental health provider, or between any of such persons and a person participating under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of diagnosis and treatment, wherever made, including communications and records which occur in or are prepared at a mental health facility . . . ."

Although § 52-146d was the subject of technical amendments in 2019; see Public Acts 2019, No. 19-98, § 24; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, I refer to the current revision of the statute.

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

ipating under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of diagnosis and treatment . . . .''

I disagree with one aspect of the majority's statutory construction, namely, its dismissal of the significance of the final clause of § 52-146d (2), ''including communications and records which occur in or are prepared at a mental health facility . . . .'' This language was added in a 1969 amendment to the statute; see Public Acts 1969, No. 819, § 1; and was intended to clarify that the privilege extends equally to patients in public mental health institutions. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1969 Sess., p. 82, remarks of Representative Mary B. Griswold (''[w]e do have protection of private patients but it has never been clearly stated that such privacy extends to patients in public institutions''); id., p. 96, remarks of Nancy Greenman (''[w]e wish to see this bill passed in order to ensure that all persons entering into psychotherapy *shall be certain of the same confidentiality* some of us have already found so helpful, and also to ensure that any of us, past or future patients, might feel perfectly free to seek help from any public facility if this should ever become necessary'' (emphasis added)). This final clause of § 52-146d (2), therefore, clarifies the legislature's intent that patients receiving treatment from public mental health care providers are statutorily entitled to the same confidentiality in their records as that enjoyed by patients receiving treatment from private mental health care providers. Accordingly, this language requires that the scope of the psychiatrist-patient privilege be construed in a manner that ensures that the privilege is applied with equal effect to persons who seek treatment from public mental health care providers.

Proper construction of the interaction between the psychiatrist-patient privilege and FOIA is crucial in attaining that objective. Each of these rights, the psychi-

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

atrist-patient privilege and the right to inspect public
records, claims priority in the law. Compare *Freedom
of Information Officer, Dept. of Mental Health & Addic-
tion Services* v. *Freedom of Information Commission,*
supra, 318 Conn. 784 (noting that "the exceptions to
the general rule of nondisclosure of communications
between psychiatrist and patient were drafted narrowly
to ensure that the confidentiality of such communica-
tions would be protected unless important countervail-
ing considerations required their disclosure" (internal
quotation marks omitted)), with *Waterbury Teachers
Assn.* v. *Freedom of Information Commission,* 240
Conn. 835, 840, 694 A.2d 1241 (1997) ("the long-standing
legislative policy of [FOIA] favoring the open conduct
of government and free public access to government
records . . . requires us to construe [its] provisions
. . . to favor disclosure and to read narrowly [its]
exceptions to disclosure" (citations omitted; internal
quotation marks omitted)). Each of the two statutory
schemes claims a broad right that cabins narrowly
crafted and interpreted exceptions. This court repeat-
edly has recognized that "[t]he people of this state enjoy
a broad privilege in the confidentiality of their psychiat-
ric communications and records . . . and the principal
purpose of that privilege is to give the patient an incen-
tive to make full disclosure to a physician in order to
obtain effective treatment free from the embarrassment
and invasion of privacy . . . . Accordingly, the excep-
tions to the general rule of nondisclosure of communi-
cations between psychiatrist and patient were drafted
narrowly to ensure that the confidentiality of such com-
munications would be protected unless important coun-
tervailing considerations required their disclosure."[4]

---

[4] There is no support for the majority's assertion that this court has charac-
terized the psychiatrist-patient privilege as "broad" *because* § 52-146d (2)
defines communications to include exchanges between three different sets
of communicants. That assertion minimizes the significance of our character-
ization of the privilege as broad. The privilege provides broad protection
and included within that principle is that exceptions are construed narrowly.
See, e.g., *Falco* v. *Institute of Living,* 254 Conn. 321, 328, 757 A.2d 571 (2000).

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

(Citations omitted; internal quotation marks omitted.)
*Falco* v. *Institute of Living*, 254 Conn. 321, 328, 757
A.2d 571 (2000). We also have recognized "the long-
standing legislative policy of [FOIA] favoring the open
conduct of government and free public access to gov-
ernment records. . . . We consistently have held that
this policy requires us to construe the provisions of
[FOIA] to favor disclosure and to read narrowly [its]
exceptions to disclosure." (Citations omitted; internal
quotation marks omitted.) *Commissioner of Emer-
gency Services & Public Protection* v. *Freedom of Infor-
mation Commission*, 330 Conn. 372, 383, 194 A.3d
759 (2018).

This court has never addressed the inherent tension
between the two statutory schemes. The legislature,
however, already has expressed its intent regarding
how to balance these competing rights by stating its
intent to provide the same level of protection to persons
receiving treatment from public and private mental
health care providers. More than in any other area of
the law, FOIA has the greatest potential to disrupt the
legislature's stated intent. Application of FOIA to com-
munications and records or identifying records that are
privileged pursuant to § 52-146e (a) cannot dilute the
protection afforded to patients who receive treatment
from public mental health care providers without con-
travening the legislature's stated intent to maintain
equal protection for patients treated by private and
public mental health care providers. When FOIA and
the psychiatrist-patient privilege collide, the privilege
must be protected. The legislature has already identified
the required and appropriate limits to the privilege in
the exceptions set forth in General Statutes §§ 52-146f
through 52-146i. A request to inspect records or to
receive a copy of records pursuant to FOIA is not one

347 Conn. 675 AUGUST, 2023 737

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

of those exceptions.[5] Accordingly, when a communication or record has been deemed to be protected by the psychiatrist-patient privilege, it is protected from disclosure in its entirety, not merely protected from unredacted disclosure.

With these statutory principles in mind, I turn to the issue of whether the commission's determination that the hospital police reports are not communications or

[5] The majority accuses me of "miss[ing] the mark" for criticizing it for providing indigent persons with less protection than those who can afford to obtain treatment from a private mental health care provider and claims that the differential treatment is simply the result of the application of FOIA. The majority's discussion of the tension between the two statutory schemes implicitly assumes that FOIA is an exception to the psychiatrist-patient privilege, fails to address the lack of such an exception in §§ 52-146f through 52-146i, and fails to account for the legislature's stated policy of providing the same level of protection to patients receiving treatment from public and private mental health care providers. Accordingly, although the majority claims that "[§] 52-146e (a) has the same coverage and limitations regardless of whether the patient seeks treatment at a state operated mental health treatment facility or a private hospital," that is no longer true because the majority has added an exception to § 52-146e (a): FOIA. See *State* v. *Whiteman*, 204 Conn. 98, 103, 526 A.2d 869 (1987) ("[i]n areas where the legislature has spoken . . . the primary responsibility for formulating public policy must remain with the legislature"). It is therefore the majority's failure to give effect to the intent of the legislature, as evidenced by the legislative history of No. 819, § 1, of the 1969 Public Acts, as well as its failure to consider statutes related to and, in fact, expressly referenced by § 52-146e (a), that result in the lower level of protection afforded to indigent persons in this state who must receive mental health treatment from public mental health care providers. See General Statutes § 1-2z ("[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes").

The exception to disclosure under FOIA for records that would compromise security at Whiting; see General Statutes § 1-210 (b) (18); has no bearing on this issue. That exception references materials such as security manuals, including emergency plans contained or referred to therein, engineering and architectural drawings of Whiting's facilities, operational specifications of security systems, training manuals, internal security audits, minutes or recordings of staff meetings and logs or documents revealing the movement of patients. See General Statutes § 1-210 (b) (18) (A) through (G). The mere fact that FOIA provides an exception to disclosure for these types of materials in relation to Whiting does not support the proposition that FOIA is an exception to the psychiatrist-patient privilege.

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

records thereof pursuant to § 52-146e (a) was supported by substantial evidence in the record. The commission determined that the reports are not "communications" or "records" as defined in § 52-146d (2) because (1) they do not "relat[e] to diagnosis and treatment of a patient's mental condition," and (2) they are not communications or records thereof "between the patient and a psychiatric mental health provider, or between a member of the patient's family and a psychiatric mental health provider, or between any of such persons and a person participating under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of diagnosis and treatment . . . ." General Statutes § 52-146d (2). Integral to the commission's conclusion was the fact that the reports were prepared by members of the hospital police.

I agree with the majority that the hospital police reports "relate to" diagnosis or treatment pursuant to § 52-146d (2). For two reasons, however, I disagree with the majority's suggestion that, although the reports "relate to" diagnosis or treatment, they somehow also do not because the "purpose" of the reports is not to be used in the diagnosis or treatment of the patient but, rather, to investigate the incident that caused the patient's death. First, confining the meaning of "relating to" in the manner suggested by the majority is inconsistent with the broad definition of that phrase. In order for the reports to relate to diagnosis or treatment, they need not have that as their purpose. If the legislature had intended to require that records be used for the purpose of diagnosis or treatment in order to be protected, it could have said so. It did not. The hospital police reports, therefore, "relate to" diagnosis or treatment if they are connected by reason of an established or discoverable relation to diagnosis or treatment. See, e.g., *Lombardo's Ravioli Kitchen, Inc.* v. *Ryan*, 268 Conn. 222, 233, 842 A.2d 1089 (2004) (defining "related"

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

as "having relationship: connected by reason of an established or discoverable relation" (internal quotation marks omitted)).

As I explain in this opinion, the hospital police reports document the treatment, albeit unsuccessful, provided to the patient, the patient's mental health diagnosis, his statements and actions prior to and during the medical emergency, as well as the observations of the mental health staff of the patient's symptoms and responses to treatment during the course of the emergency. Those facts are more than sufficient to establish the broad connection necessary to support the conclusion that the reports are related to diagnosis or treatment.

Second, the majority's suggestion that the hospital police reports served solely investigative purposes does not find support in the record. During the hearing before the commissioner, the hearing officer asked Diana Lejardi, the plaintiff's freedom of information officer, whether certain hospital police reports would be "used for the diagnosis or treatment of [a patient]," and whether "medical personnel at Whiting . . . would . . . look at the [reports] in order to make their decisions about treatment . . . ." I note that the hearing officer's inquiry indicates that he incorrectly understood the term "relating to" to be limited to "used for" the purpose of diagnosis or treatment. Even with this incorrect, narrow framing of the inquiry, Lejardi responded that "there may be information [in hospital police reports] . . . that . . . the medical team or treatment team may use . . . ." When the hearing officer rephrased his inquiry to be consistent with the statutory language, Lejardi provided a more definitive response. Specifically, the hearing officer asked Lejardi whether hospital police reports "could contain medical or psychiatric information that's relevant to the treatment of [a patient]," and, without qualification, Lejardi responded, "yes."[6]

---

[6] This court's holding in *Freedom of Information Officer* that records documenting medical treatment relate to a patient's mental health treatment;

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

In support of its determination that the hospital police reports do not relate to diagnosis or treatment, the commission stated that "the . . . reports prepared by [the hospital police] do not reflect diagnosis or treatment made by others." That statement is belied by the reports themselves, which, as I explained, summarize in detail both the treatment provided to the patient and the observations of medical and mental health staff regarding the patient's symptoms and responses to the emergency medical treatment provided to him. In addition, from the information that the majority concludes must be disclosed, the public will learn of the nature of the patient's commitment, his multiple diagnoses, his perceived level of dangerousness, his required level of supervision, some of his prior concerning behaviors, as well as statements that he made to mental health staff and that staff made to him, which are indisputably communications. Without question, in light of this court's holding in *Freedom of Information Officer* that the provision of physical medical treatment at inpatient facilities is encompassed within mental health treatment; *Freedom of Information Officer, Dept. of Mental Health & Addiction Services* v. *Freedom of Information Commission,* supra, 318 Conn. 790–91; the hospital police reports relate to the patient's treatment and diagnosis. The commission's determination otherwise does not find support in the record and is grounded on an incorrect construction of the phrase "relating to" in § 52-146d (2).

I offer a final, general observation on the requirement that records relate to diagnosis or treatment. This court has not yet had occasion to consider whether records created after the death of a patient fall within the protec-

*Freedom of Information Officer, Dept. of Mental Health & Addiction Services* v. *Freedom of Information Commission,* supra, 318 Conn. 790–91; logically extends to records that document information relating to the diagnosis of a medical condition.

347 Conn. 675 AUGUST, 2023 741

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

tion of § 52-146e (a). The statutory scheme, however, contemplates that the protection of the privilege continues following the death of a patient. In order to disclose records that are privileged pursuant to § 52-146e (a), unless the records fall under a statutory exception, one must first obtain the consent of the patient or the patient's authorized representative. Section 52-146d (1) defines "authorized representative" to include, "if a patient is deceased, his or her personal representative or next of kin . . . ." General Statutes § 52-146d (1) (B); see also *Freedom of Information Officer, Dept. of Mental Health & Addiction Services* v. *Freedom of Information Commission,* supra, 318 Conn. 771 (applying privilege to records of patient who had died decades before request was filed pursuant to FOIA). Although the records at issue in *Freedom of Information Officer* were created prior to the patient's death, nothing in that decision or in the statutory scheme precludes the application of the privilege to such records. Indeed, given the emergent nature of the medical incident in the present case, it would have been impossible to create such records while the patient remained alive. Some of the reports were created within twenty-four hours of the patient's death.

If the legislature had intended to restrict the privilege to records that were created during the patient's life, it could have designated the required connection between the records and diagnosis or treatment more narrowly, such as limiting the privilege to records *used* in diagnosis or treatment.

I next consider the requirement in § 52-146d (2) that the communications and records thereof must be "between the patient and a psychiatric mental health provider, or between a member of the patient's family and a psychiatric mental health provider, or between any of such persons and a person participating under the supervision of a psychiatric mental health provider

in the accomplishment of the objectives of diagnosis and treatment . . . .'' It is significant that the hospital police reports include communications between different members of Whiting's mental health staff and between mental health staff and the patient. The reports, therefore, must be evaluated on two levels. First, whether the reports are communications between one of the three required sets of communicants, and, second, whether the communications documented in the reports are between any of the three sets of communicants.

In concluding that the hospital police reports were not communications between any of the required sets of communicants, the commission gave no consideration to the fact that the reports include communications among mental health staff and between mental health staff and the patient. It relied solely on its determination that hospital police officers ''do not participate in the diagnosis or treatment of a patient's mental condition . . . .'' That determination requires a more concrete link between the officers and diagnosis and treatment than is supported by the language of § 52-146d (2), which requires only that the officers work ''under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of diagnosis and treatment . . . .'' The commission also ignored the communications documented in the hospital police reports among the mental health staff and between the mental health staff and the patient.

Contrary to the commission's conclusion, the testimony provided before the hearing officer established that the hospital police officers who prepared the reports are ''person[s]'' who ''participat[e] under the supervision of a psychiatric mental health provider in the accomplishment of the objectives of diagnosis and treatment . . . .'' General Statutes § 52-146d (2). With respect to the requirement that the participation of the hospital police officers be ''under the supervision of a

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

psychiatric mental health provider''; General Statutes
§ 52-146d (2); it is undisputed that the officers are sta-
tioned and employed at Whiting, and that, at the time
the reports were created, Whiting was under the super-
vision of its chief executive officer, Michael Norko, a
forensic psychiatrist. The record therefore establishes
that the hospital police officers participated under the
supervision of a psychiatric mental health provider.

With respect to the requirement that the participation
of the hospital police officers be ''in the accomplish-
ment of the objectives of diagnosis and treatment'';
General Statutes § 52-146d (2); the hospital police
reports themselves, which detail the treatment adminis-
tered to the patient and document information related
to diagnosis, provide the best demonstration that the
officers' work served this purpose. Additionally, Lejardi
testified before the hearing officer that, because Whit-
ing is a maximum security facility, the hospital police
are sometimes required to assist in dealing with patients
who exhibit severe behaviors. She further testified that
the officers receive specific training for their positions,
interact with Whiting patients and staff daily, and are
aware of the patients' behaviors and triggers. I agree
with the trial court's observation that this testimony
established that ''[t]he [hospital] police work integrally
with the mental health care providers at Whiting . . .
to deliver overall mental health care. The dedicated
police force maintains order and promotes the safety of
staff and patients as psychiatric services are delivered.
Given the type of patients and psychiatric services deliv-
ered at Whiting . . . it would not be reasonably possi-
ble to deliver the treatment provided without the
services of the [hospital] police.''

On the basis of this record, I conclude that the hospi-
tal police worked ''in the accomplishment of the objec-
tives of diagnosis and treatment . . . .'' General

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

Statutes § 52-146d (2).[7] That is, their services provide
a necessary foundation for the provision of diagnosis
and treatment of patients. Their role, therefore, is one
that serves "the accomplishment of the objectives of
diagnosis and treatment . . . ." General Statutes § 52-
146d (2). By requiring instead that the hospital police
participate in diagnosis and treatment directly, the com-
mission relied on a misinterpretation of § 52-146d (2)
and did not properly apply the law to the facts of the
case. Its conclusion, therefore, was not supported by
substantial evidence in the record.

As I noted previously, the commission also gave no
effect to the inclusion in the hospital police reports of
communications between the patient and Whiting staff
members and between different staff members. The
reports, therefore, are not only, in and of themselves,
protected communications, but are also records of priv-
ileged communications. Included in the reports are
direct quotes of statements that the patient made to
two forensic treatment specialists, communications
between medical care providers, communications
between mental health staff, a direct quote from a differ-
ent patient communicating with mental health staff, and
communications between mental health staff and the
medical doctor on call on the night of the incident. I
acknowledge that some of the reports do not record

---

[7] The majority reasons that this requirement is met only if those who
prepared the records were participating in the accomplishment of the objec-
tives of diagnosis and treatment *at the time that they prepared the records.*
The insertion of this language into § 52-146d (2) gratuitously narrows its
scope, inconsistent with this court's repeated recognition that this court
construes the privilege broadly. See *Falco* v. *Institute of Living,* supra, 254
Conn. 328. Section 52-146d (2) requires only that this group of communicants
are persons "participating under the supervision of a psychiatric mental
health provider in the accomplishment of the objectives of diagnosis and
treatment . . . ." As I have observed, Lejardi's testimony supports the con-
clusion that even the more narrow definition of this class of communicants
is met in the present case. As a matter of statutory interpretation, however,
I disagree with the majority's narrow reading of § 52-146d (2).

347 Conn. 675 AUGUST, 2023 745

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

communications between patients or staff. It is also true that the reports that include such communications also incorporate information in addition to such communications. Nothing in § 52-146d (2), however, suggests that portions of records should be scrutinized to determine which portions constitute records of privileged communications and which do not, or that there is some percentage threshold that determines whether hybrid records constitute records of privileged communications. Accordingly, I conclude that the commission improperly failed to give any effect to the privileged communications recorded in the hospital police reports.

Because the hospital police reports are privileged records pursuant to § 52-146e (a), they are not public records pursuant to FOIA. The exemption claimed by the plaintiff, which is set forth in General Statutes § 1-210 (a), provides in relevant part: "*Except as otherwise provided by any federal law or state statute*, all records maintained or kept on file by any public agency . . . shall be public records and every person shall have the right to (1) inspect such records . . . (2) copy such records . . . or (3) receive a copy of such records . . . ." (Emphasis added.) The plain language of § 1-210 (a) provides that records that fall within the otherwise provided by law exception are not "public records" for purposes of FOIA. This court has held that this exemption applies to "federal and state laws that, by their terms, provide for confidentiality of records or some other similar shield from public disclosure." *Chief of Police* v. *Freedom of Information Commission*, 252 Conn. 377, 399, 746 A.2d 1264 (2000). Because § 52-146e (a) expressly provides for confidentiality of records, the exemption to disclosure in § 1-210 (a) applies and the hospital police reports are not public records pursuant to FOIA. See General Statutes § 1-210 (a); see also *Commissioner of Public Safety* v. *Freedom of Information Commission*, 204 Conn. 609, 623, 529 A.2d 692

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

(1987) (conclusion that records fell within exemption
to disclosure set forth in predecessor to § 1-210 (a)
disposed of administrative appeal because "records
[that] are not governed by . . . FOIA do not fall within
the jurisdiction of the [commission]").

## II

I disagree with the majority's narrow interpretation
of the scope of protection afforded by the second sen-
tence of § 52-146e (a), which protects "communications
and records or the substance or any part or any resume
thereof" that identifies a patient by prohibiting the dis-
closure or transmittal of such records without the con-
sent of the patient or his authorized representative,
"[e]xcept as provided in sections 52-146f to 52-146i,
inclusive . . . ."[8] General Statutes § 52-146e (a). The
majority blunts the effect of the second sentence of
§ 52-146e (a) by ignoring the consent requirement and
statutorily enumerated exceptions thereto, stating that
"the only information that is privileged under § 52-146e
(a) is 'the substance . . . part or . . . resume' of 'com-
munications and records as defined in section 52-146d
(2)' . . . ." (Footnote omitted.) The majority effec-
tively revises § 52-146e (a) by deleting the second sen-
tence and incorporating the phrase "the substance . . .
part or . . . resume thereof" into the first sentence of
the statute. Contrary to the language of § 52-146e (a)
that expressly prohibits disclosure of such records with-
out first obtaining a patient's consent or demonstrating
that one of the statutory exceptions applies, the major-
ity concludes that they are required to be disclosed
pursuant to FOIA. According to the majority, the only

[8] General Statutes § 52-146d (4) defines "identifiable" and "identify a
patient" as "communications and records which contain (A) names or other
descriptive data from which a person acquainted with the patient might
reasonably recognize the patient as the person referred to, or (B) codes or
numbers which are in general use outside of the mental health facility which
prepared the communications and records . . . ."

347 Conn. 675 AUGUST, 2023 747

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

measure required before disclosing these statutorily privileged records is the redaction of the patient's name, and very little else, despite the commission's finding that the requesting parties knew the patient's name, a fact that renders redaction meaningless. That narrow interpretation not only conflicts with the plain language of the § 52-146e (a) but also fails to consider related statutes, which clarify the legislature's intent to give broad power to the patient or the patient's authorized representative to withhold consent and which demonstrate that the legislature already has identified the appropriate exceptions when consent is not required prior to disclosure. The majority's reading of § 52-146e (a) also conflicts with our controlling case law and flouts the legislature's stated public policy of providing the same level of protection to those who receive treatment at public and private mental health care institutions.

The determination of the scope of protection afforded by § 52-146e (a) to records that identify a patient presents an issue of statutory interpretation, over which we exercise plenary review, guided by established principles for discerning legislative intent. See, e.g., *Fay* v. *Merrill*, 336 Conn. 432, 446, 246 A.3d 970 (2020) (describing plain meaning rule, as set forth in General Statutes § 1-2z, and principles for discerning legislative intent).

My review of § 52-146e (a) reveals that its protection of identifying records sweeps broadly, protecting more than communications and records, and establishing a clearly defined and narrow path to permissible disclosure, a path that was not followed in the present case. The second sentence of § 52-146e (a) provides: "Except as provided in sections 52-146f to 52-146i, inclusive, no person may disclose or transmit any communications and records or the substance or any part or any resume thereof which identify a patient to any person, corpora-

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

tion or governmental agency without the consent of the patient or his authorized representative.''

In addition to protecting communications and records themselves, the second sentence of § 52-146e (a) protects the "substance" of such communications or records, "any part" of such communications or records, and "any resume" of such communications or records.[9] Therefore, a record that identifies a patient—for example, a hospital police report—is privileged if the record includes the substance or any part of a privileged communication or record, or if the record constitutes a "resume" or summary of a privileged communication or record.[10] The hospital police reports, which include the substance of and summarize privileged communications and are themselves, in part, privileged communications, satisfy this requirement. This provision ensured, until today, that a person filing a request under FOIA could not circumvent the psychiatrist-patient privilege by requesting a communication or record prepared by someone other than a psychiatric mental health care provider that duplicates in whole, part, or summary form, the same privileged information that would otherwise be protected by § 52-146e (a). Under the majority's analysis, however, that is now permitted.

Related statutes, which the majority does not consider, make clear that the statutory scheme grants the patient or the patient's authorized representative an extraordinary measure of control over the disclosure

[9] I disagree with the majority's suggestion that we may not consider this language in § 52-146e (a). The plaintiff has relied on § 52-146e (a) as support for its claim that the hospital police reports are privileged and has relied specifically on the statute's protection of records that identify a patient. That claim requires us to construe and apply the statutory language, including the second sentence of § 52-146e (a), to determine whether the plaintiff properly has refused disclosure on the basis of § 52-146e (a).

[10] The term "resume" is not defined in the statutory scheme. One dictionary defines "resume" as "a summing up: a condensed statement . . . ." Webster's Third New International Dictionary (2002) p. 1937.

347 Conn. 675        AUGUST, 2023        749

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

of identifying records and provides a detailed, comprehensive list of the applicable exceptions to the consent requirement. The statutory scheme clearly defines the narrow path to disclosure. An identifying record that is privileged pursuant to § 52-146e (a) can be disclosed only if one of two conditions is met: (1) the patient or his authorized representative consents to the disclosure, or (2) one of the statutory exceptions applies. As I noted previously, the filing of a request pursuant to FOIA is *not* one of the exceptions to the consent requirement.[11]

The requirement that the individual seeking disclosure must first obtain the patient's consent is not readily circumscribed. Only "the patient or his authorized representative" may give consent for disclosure. General Statutes § 52-146e (a). Section 52-146d (1) defines "authorized representative" as "(A) a person empowered by a patient to assert the confidentiality of communications or records which are privileged under sections

---

[11] Even in the more compelling context of a criminal defendant's claim that the failure to disclose a witness' psychiatric records violates the defendant's right to confrontation, the records may not be disclosed without the witness' consent. See, e.g., *State* v. *Slimskey*, 257 Conn. 842, 855, 779 A.2d 723 (2001) (following in camera review of records, if court determines records are probative of witness' credibility, state must obtain witness' waiver of privilege prior to disclosure). If the witness refuses to consent to disclosure of probative psychiatric records, the testimony of the witness is stricken. Id., 855–56.

I acknowledge that a criminal defendant may be entitled to a witness' psychiatric records in the absence of the consent of the witness when the defendant claims that the privileged records are material to a claim of self-defense. See, e.g., *State* v. *Fay*, 326 Conn. 742, 745–46, 167 A.3d 897 (2017). The defendant's burden in demonstrating that the privilege is overridden by the defendant's constitutional right to present a defense, however, is high. Before a court may undertake an in camera review of the witness' psychiatric records, "the accused first must demonstrate a compelling need for the privileged records, a showing predicated on the relevance of the records to the claim of self-defense, the potential significance of the records in establishing that defense, and the unavailability of alternative sources of similar information." Id., 751. Members of the public filing FOIA requests are not required to meet such a burden. Significantly, there was no claim in the present case of a compelling need for the hospital police reports.

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

52-146c to 52-146i, inclusive, or (B) if a patient is deceased, his or her personal representative or next of kin, or (C) if a patient is incompetent to assert or waive his privileges hereunder, (i) a guardian or conservator who has been or is appointed to act for the patient, or (ii) for the purpose of maintaining confidentiality until a guardian or conservator is appointed, the patient's nearest relative . . . .''

The scope of consent, when given, is defined narrowly, authorizing disclosure only to the person or agency designated in the consent and only for the specific use designated in the consent. See General Statutes § 52-146e (b). (''[a]ny consent given to waive the confidentiality shall specify *to what person or agency* the information is to be disclosed and *to what use* it will be put'' (emphasis added)) Additionally, pursuant to § 52-146e (c), the patient or the patient's authorized representative may withdraw consent at any time. The power to withhold, limit, or withdraw consent does not end with the patient's death. As I observed previously, § 52-146d (1) provides that, if a patient is deceased, the patient's ''authorized representative'' is ''his or her personal representative or next of kin . . . .'' General Statutes § 52-146d (1) (B).

If a patient or the patient's authorized representative does not consent to disclosure, the privilege may be overcome if one of the exceptions enumerated in §§ 52-146f through 52-146i applies.[12] The exceptions are comprehensive. No consent is required for disclosure when (1) the disclosure is to other persons or mental health care providers engaged in the diagnosis or treatment of the patient; General Statutes § 52-146f (1); (2) the mental health care provider determines that there is a

[12] I note that, although the language of § 52-146e (a) suggests that §§ 52-146f through 52-146i set forth exceptions to the consent requirement, § 52-146i pertains only to the labeling of confidential records when they are disclosed.

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

substantial risk of imminent physical injury by the patient to himself or others; General Statutes § 52-146f (2); (3) the disclosure is to individuals or agencies involved in the collection of fees for the mental health services provided to the patient; General Statutes § 52-146f (3); (4) the disclosure is in certain court proceedings, including conservatorship and competency hearings, is limited to issues involving the patient's mental condition, and the patient was informed prior to making the communications that they would be admissible; General Statutes § 52-146f (4); (5) in a civil proceeding, the patient, or a representative or beneficiary of a deceased patient, has introduced the patient's mental condition as an element of a claim or defense, and the court has found that the interests of justice require disclosure; General Statutes § 52-146f (5); (6) the disclosure is to the Commissioner of Public Health or the Commissioner of Mental Health and Addiction Services in the context of an inspection, investigation, or examination of a mental health institution's communications or records; General Statutes § 52-146f (6); (7) the disclosure is to the immediate family or legal representative of a victim of a homicide committed by a patient who has been adjudicated not guilty by reason of mental disease or defect pursuant to General Statutes § 53a-13, provided that the request is not later than six years after such adjudication and the records shall be available only during the pendency and for use in a civil action relating to the patient; General Statutes § 52-146f (7); (8) a provider of behavioral health services that contracts with the plaintiff requests payment, and disclosure is to the plaintiff for the limited purpose of determining whether payment is warranted and to make the payment; General Statutes § 52-146f (8); (9) the disclosure is to a person engaged in research, limited to records necessary for such research, the director of the mental health facility has reviewed and approved the

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

research plan, and the director and researcher remain
responsible for preserving the patient's anonymity; General Statutes § 52-146g; or (10) the disclosure is requested
from individuals or facilities under contract with the
plaintiff by the Commissioner of Mental Health and
Addiction Services, pursuant to his or her obligation
under General Statutes § 17a-451 "to maintain the over-
all responsibility for the care and treatment of persons
with psychiatric disorders or substance use disorders."
General Statutes § 52-146h.

This court has held that no exceptions are available
beyond those statutorily enumerated and that it is "con-
trary to the language of [§ 52-146e] and the intent of
the legislature for courts to make discretionary case-
by-case determinations of when the privilege may be
overridden." *Falco* v. *Institute of Living*, supra, 254
Conn. 331. That conclusion is consistent with the legis-
lative history of § 52-146e. Specifically, when the psychi-
atrist-patient privilege was first enacted in 1961,
legislators considered whether to amend the statute to
allow a trial court to determine on a case-by-case basis
whether in "justice and equity" the privilege should be
invoked. 9 H.R. Proc., Pt. 8, 1961 Sess., p. 3946, remarks
of Representative Homer G. Scoville; id. (proposing
amendment to allow courts to consider "justice and
equity" in determining whether to apply privilege). That
amendment was rejected after other representatives
spoke against it, arguing that the amendment ran the
risk that a patient's decision not to disclose privileged
information could be "overruled" by a judge.[13] See, e.g.,

---

[13] Setting aside the legislature's concerns about judicial discretion, there
is nevertheless a big difference between a court's carefully applying the
privilege in a litigated case in which the person who is the subject of the
records, or an authorized representative thereof, will have notice and a right
to be heard, and the commission's release of a person's confidential records
to honor the interest of any random member of the public. The press (in
all of its varied permutations), coworkers, and even nosy neighbors can
easily manipulate access to someone's psychiatric records if they know the
person's name or sufficient details as to the timing of or certain occurrences
during the person's hospitalization. There is no bar to subsequently naming

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

id., p. 3948, remarks of Representative Nicholas B. Eddy. Others contended that allowing a judge to weigh in would eviscerate the privilege. See, e.g., id., p. 3950, remarks of Representative Robert J. Testo. If the legislature had intended that a request pursuant to FOIA should constitute an exception to the psychiatrist-patient privilege, it would have created an additional statutory exception. It did not.

The majority's suggestion that the redaction of the patient's name is somehow sufficient to safeguard the patient's privilege rings particularly hollow in the present case, in which the commission found that both complainants, Josh Kovner and The Hartford Courant, "know the identity of the patient . . . ." Given that finding, which is not challenged on appeal, the redaction ordered by the majority is a purely mechanical application of § 52-146e (a), without any meaningful effect in protecting the patient's privilege.

The majority's narrow interpretation of the protection provided to identifying records directly contradicts this court's controlling case law. This court has stated that "the protection of communications that identify a patient are central to the purpose of . . . [§] 52-146e (a) [which] specifically prohibits the disclosure or transmission of any communications or records that would identify a patient . . . ." (Internal quotation marks omitted.) *Falco* v. *Institute of Living*, supra, 254 Conn. 328–29. In *Falco*, the *only* information at issue was the name, home address, and social security number of an inpatient at a mental health facility. Id., 323. This court held that the purely administrative information was protected from disclosure by the statutory privilege. Id., 329. The court explained: "The confidentiality of a

the patient when one files a request for records under FOIA. Only the keeper of the records and the commission will be responsible for protecting the patient's identity at the time the disclosure is ordered.

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

patient's identity is as essential to the statutory purpose of preserving the therapeutic relationship as the confidentiality of any other information in a patient's communications and records.'' Id.

The majority claims that, because the parties in *Falco* agreed that § 52-146e (a) applied, this court did not consider whether the records at issue in that case fell under the protection of § 52-146e (a). Even if I were to accept the majority's implicit premise—that this court would accept as its starting point, without any inquiry, a potentially incorrect interpretation of a statute merely because the parties agreed on that incorrect interpretation—that is not what happened in *Falco*. Rather, in that decision, the court focused on the aspect of the statute on which the parties disagreed—"whether the psychiatrist-patient privilege against disclosure, pursuant to . . . § 52-146e, is subject to any exceptions beyond those enacted by the legislature." (Footnote omitted.) Id., 322–23. By necessity, however, the court also discussed whether the records at issue were privileged pursuant to the statute. See id., 328–29.

An excerpt from *Falco* demonstrates that the majority incorrectly represents this court's analysis in that case. In support of its conclusion that § 52-146e (a) protects records that identify a patient, the court in *Falco* stated: "Section 52-146e (a) specifically prohibits the disclosure or transmission of any communications or records that would 'identify a patient . . . .' Section 52-146d provides that the phrase ' "identify a patient" refer[s] to communications and records which contain (A) names or other descriptive data from which a person acquainted with the patient might reasonably recognize the patient as the person referred to,[14] or (B) codes or numbers which

_____

[14] Kovner and The Hartford Courant, for example, knew the name of the patient in the present case. It was therefore impossible for the plaintiffs to disclose the hospital police reports to them without identifying him.

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

are in general use outside of the mental health facility which prepared the communications and records . . . .' Further, the fact that an explicit exception contained in subdivision (3) of § 52-146f permits the disclosure of a patient's 'name, address and . . . [t]hat the person was in fact a patient' for purposes of collection disputes between the hospital and the patient, lends weight to our conclusion that *the general rule against disclosure applies with equal force to identity as to other information.*'' (Emphasis added; footnote added.) *Falco* v. *Institute of Living*, supra, 254 Conn 329. That analysis is clearly a statutory construction of the meaning and scope of the protection afforded to identifying records, regardless of how the majority chooses to characterize it. Consistent with this court's decision in *Falco*, therefore, because the hospital police reports at issue in the present case identify the patient, they are privileged records.

III

As I stated at the beginning of this opinion, the combined effect of the majority's two conclusions—that the hospital police reports are not privileged communications or records thereof because they were prepared by members of the hospital police and that identifying records are not privileged pursuant to § 52-146e (a)—guts the privilege of persons who receive mental health treatment from public mental health care providers, contrary to the intent of the legislature. The majority ignores the reality of treatment at Whiting, namely, that the hospital police, whose services provide a necessary foundation for the provision of safe, quality care to patients, routinely prepare reports that document incidents that occur at the hospital. Some of those reports, like those at issue in this appeal, include precisely the type of information that the psychiatrist-patient privilege is designed to protect. Undoubtedly, this same information is also routinely documented in reports pre-

Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

pared by staff members who directly provide mental health and medical care to the patients. Under the rule crafted by the majority, the second category of reports are likely protected by the patient-psychiatrist privilege. A member of the public may obtain the identical information, however, simply by requesting the hospital police reports. The majority's rule thus allows the public to circumvent the protections afforded to patients by the psychiatrist-patient privilege.

The majority undermines the equal protection the legislature sought to afford to those receiving treatment from public mental health care providers by declining to give effect to the extensive statutory protections given to records that identify a patient. No consent was given, or even sought, for the release of the patient's privileged identifying records. No statutory exception applies. Yet, the majority orders the release of the records despite the commission's finding that those requesting them knew the patient's name.

Finally, I observe that the majority opinion is contrary to the principal purpose of the psychiatrist-patient privilege, which is "to give the patient an incentive to make full disclosure to a physician in order to obtain effective treatment free from the embarrassment and invasion of privacy which could result from a doctor's testimony." *State* v. *White*, 169 Conn. 223, 234–35, 363 A.2d 143, cert. denied, 423 U.S. 1025, 96 S. Ct. 469, 46 L. Ed. 2d 399 (1975). No one should be deterred from receiving treatment from a public mental health care provider due to fears that his or her private information is less protected because he or she cannot afford treatment from a private provider. In addition to the risk that embarrassing, acutely personal information may be revealed, persons seeking mental health treatment risk the stigma grafted onto the mentally ill by our society. Unfortunately, that stigma persists, and its effects are devastating to our societal mental health. In 1999, the

347 Conn. 675        AUGUST, 2023                757
Commissioner of Mental Health & Addiction Services *v.*
Freedom of Information Commission

Surgeon General of the United States reported: "The stigma that envelops mental illness deters people from seeking treatment. Stigma assumes many forms, both subtle and overt. It appears as prejudice and discrimination, fear, distrust and stereotyping. It prompts many people to avoid working, socializing, and living with people who have a mental disorder. Stigma impedes people from seeking help for fear that the confidentiality of their diagnosis or treatment will be breached. . . . Powerful and pervasive, stigma prevents people from acknowledging their own mental health problems, much less disclosing them to others." U.S. Dept. of Health & Human Services, Mental Health: A Report of the Surgeon General (1999) p. 454, available at https://profiles.nlm.nih. gov/spotlight/nn/catalog/nlm:nlmuid-101584932X120-doc (last visited August 21, 2023). Relevant to many patients in Whiting, "involuntary commitment and hospitalization generally have been found to have an even greater stigmatizing effect than being perceived as mentally ill or receiving outpatient treatment." A. Bornstein, Note, "The Facts of Stigma: What's Missing from the Procedural Due Process of Mental Health Commitment," 18 Yale J. Health Policy, L. & Ethics 127, 137 (2018). Hospital police and other security providers in mental health institutions often intervene when a patient is exhibiting severe and concerning behaviors that treatment seeks to prevent or control. If such information is so easily exposed to the public, how do we as a society protect a recovered person's reputation and guarantee that person a future free of societal stigma? Undercutting the level of protection afforded to those who receive care from public mental health care providers risks increasing the effect of stigma in deterring people from seeking treatment.

For the foregoing reasons, I respectfully dissent.